**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MARK MICHAEL FORD, | Case No. 2:13-cv-00087-APG-PAL |
| *Petitioner*, | |
| | **ORDER** |
| vs. | |
| BRIAN WILLIAMS, | |
| *Respondent*. | |

This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on the merits as to the remaining claims.

### Background

Petitioner Mark Michael Ford challenges his 2004 Nevada state conviction, pursuant to a jury verdict, of second-degree murder with the use of a deadly weapon and burglary while in the possession of a deadly weapon. He was sentenced to: (a) two consecutive sentences of life with the possibility of parole after ten years on each sentence on the murder charge and weapon enhancement; and (b) a term sentence of 22 to 96 months on the burglary charge consecutive to the foregoing sentences. He challenged his conviction on both direct appeal and state post-conviction review.

### Standard of Review

When the state courts have adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). Under this deferential standard of review, a federal court may not grant relief merely because it might conclude that the decision was incorrect. 563 U.S. at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 563 U.S. at 181-88.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S.Ct. 1697, 1702 (2014)(internal quotation marks omitted).

When a state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973.

Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by

> substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 569.

### Discussion

### Ground 1 – Voluntary Statement

In the portion of Ground 1 that remains before the Court,[1] petitioner alleges that his rights under the Fifth and Sixth Amendments as recognized in the *Miranda*[2] decision were violated after the police allegedly "did not correctly follow procedures for arresting" and interrogating him.[3]

### Factual Background

As discussed further *infra* as to Ground 4(a)(2), evidence at trial tended to establish that Ford unlawfully entered the home where Vincent Gomes was living, through a bathroom window. Ford thereafter stabbed Gomes in the neck while Gomes was calling 911. Ford left the scene on a moped moments later. Gomes died from the stab wound before help could arrive.

Ford killed Gomes on February 24, 2003. As discussed further below, Ford was arrested and interviewed that same date. On that date, Ford was fifteen years and seven months old.[4]

---

[1]See ECF No. 41, at 9 (dismissing other portions of the ground).

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[3]ECF No. 28, at 7.

[4]See, e.g., ECF No. 16 (Exhibit 51), at 50 (date of birth). Unless otherwise noted, all page citations herein are to the CM/ECF generated electronic document page number in the page header, not to any page number in the original transcript or document. The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes same solely as background to the issues presented in this case, and it does not summarize all such material. No statement of fact made in describing statements,

(continued...)

-3-

As backdrop, according to history provided to a clinical psychologist retained by the defense in May 2003:[5] (1) Ford was born in Lithuania;[6] (2) his mother moved to the United States when he was five years old and initially left him in Lithuania for two years, first briefly with his godparents and then his maternal grandparents;[7] (3) when he first started school in the United States he could not speak English "well" and reportedly was picked upon as a result;[8] (4) however, he "learned the language rather quickly" and completed first and second grade in one year, doing "well" in school;[9] (5) Ford thereafter obtained As and Bs in school and exhibited no behavioral issues at home or in school during the third

---

[4](...continued)
testimony or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering petitioner's claims.

[5]ECF No. 54-6, at 2-27. The material summarized in the text is drawn from a report by John Paglini, Psy. D., submitted in support of a defense motion to set reasonable bail with house arrest. The Paglini report, in a broad sense, would have been known to and available to the state district court when it later ruled on the motion to suppress. However, as discussed further *infra*, petitioner did not rely upon factual allegations or argument as to petitioner's background or mental status as reflected in the Paglini report at any point while arguing the motion to suppress to the state district court, while arguing this specific issue on direct appeal to the state supreme court, or in presenting the requisite specific factual allegations supporting Ground 1 in the counseled second amended petition in federal court. Petitioner presented such factual argument in the context of legal argument challenging the voluntariness of his statement for the first time in state or federal court in the federal reply, at which time a copy of the above-referenced pretrial motion and Paglini report also was filed into the federal record in this matter. At this juncture, the Court simply summarizes, in substantially chronological order, the points that petitioner now argues relate to the admission of his statement – along with additional material from the report providing relevant context – leaving discussion of other issues pertaining to the late-breaking factual argument until later in this order.

Petitioner also relies in his reply on his own testimony at trial for history. *Inter alia*, such testimony would not have been included in the record before the state district court at the time that the court ruled on the motion to suppress.

[6]ECF No. 54-6, at 6.

[7]*Id.* The history reflects that Ford's mother would speak to him on a weekly basis during these two years.

[8]*Id.*

[9]*Id.*, at 6-7. In the federal reply, petitioner's counsel cites the same pages of the Paglini report as support for the statement that Ford "had to repeat the first and second grades." ECF No. 53, at 8. The report makes no such statement. The report does reflect that children in Lithuania do not start kindergarten until age six. Ford testified at trial that, after first living in the Boston area, he was eight by the time that he reached Las Vegas and started school. He testified that "I had to go through first and second grade, because – I was supposed to go to third grade, but I had to take first and second to advance to third." ECF No. 16, at 52. It thus would appear that (a) Ford by his age should have been in the third grade by the time that he reached Las Vegas, but (b) he had not yet attended either first or second grade. He thus did not have to *repeat* first and second grades. He instead had to *take* the first and second grade courses for the very first time; and he completed the course requirements in one year rather than two, while learning English.

-4-

through fifth grades, with Ford participating in baseball the latter two years, despite his stepfather reportedly being critical and nonsupportive;[10] (6) family stressors increased thereafter, however, after the stepfather had triple bypass surgery and a prolonged rehabilitation at home; and Ford reported that he began smoking marijuana in the sixth grade;[11] (7) Ford's grades slipped in the sixth grade in 1999 to 2000 to As and Bs with Cs; he did not participate in sports; and he had some fights and "minor trouble;" (8) in or around seventh grade, in 2000 to 2001, Ford learned that his father had committed suicide in Lithuania; he had been physically abused by his stepfather; the stepfather became more seriously ill; the family learned that the stepfather years before had sexually molested his daughter and apparently thereafter also Ford's sister; Ford became involved with other adolescents of whom his mother did not approve, and she caught him with marijuana; and he was arrested for possession of marijuana and thereafter also for another offense;[12] (9) by eighth grade, in 2001 to 2002, Ford's grades were down to Bs and Cs; (10) at around this time, a physician placed Ford on Zoloft "due to the issues pertaining to his father's death . . . and other stressful family issues;"[13] (11) in or around this same time period, Ford was stabbed in the back with a knife by another adolescent; he was shot by another older adolescent with a BB gun in an apparently random incident; his mother filed for divorce from his stepfather, who ultimately passed away; and she remarried;[14] and (12) by ninth grade, in 2002 to 2003, Ford had only "average grades;" he was having minor behavioral issues at school (*e.g.* spitting on someone); and he was arrested for more criminal offenses, with his mother ultimately opting for home schooling.[15]

---

[10]ECF No. 54-6, at 7-8.

[11]*Id.*, at 8 & 13.

[12]*Id.* at 8-9 & 21.

[13]*Id.*, at 10.  The federal reply states that Ford's father committed suicide and that Ford was placed on Zoloft while he was in the fourth grade.  ECF No. 43, at 8.  The Paglini report instead reflects that these events occurred in or around seventh grade.

[14]ECF No. 54-6, at 10-11, 21 & 25.

[15]*Id.*, at 10-11 & 14-15.

The psychologist's May 2003 report further reflects that three months following his arrest and despite 23-hour lockdown confinement:[16] (1) Ford was alert, oriented, cooperative; his mood and effect were stable; his thought processes were logical and goal oriented; he had no concentration problems; his thought content did not reflect delusions; and he denied suicidal or homicidal ideation;[17] (2) Ford reported that he stopped using marijuana in the spring of 2002 and that, while he had experimented once each with methamphetamine, acid (LSD), and alcohol as well as (psilocybin) mushrooms twice, he had not continued using these substances thereafter;[18] (3) Ford understood the different roles played by the various court, legal and other personnel involved in his case;[19] (4) considering his age, he had an adequate knowledge of legal concepts, had demonstrated adequate legal reasoning skills, and was competent to stand trial and aid and assist defense counsel; and (5) while the report found that Ford had adjustment disorder with depressed mood, oppositional disorder – moderate, cannabis abuse in full remission, and adolescent antisocial disorder, the report did not include any explicit findings that Ford – at the time of the evaluation or previously – had any cognitive impairments and/or psychological conditions that would impair his ability to understand *Miranda* warnings at the time of his arrest and to voluntarily consent to giving a statement after having been so advised.

As further backdrop, by the time of his February 24, 2003 arrest in the present case, Ford already had fairly extensive prior experience with law enforcement. Prior to that time, he previously had been arrested and charged – and given *Miranda* warnings – in Clark County, Nevada, at the very least:[20] (1)

---

[16]Petitioner was a juvenile held in an adult facility, and he accordingly was kept in the equivalent of protective or administrative segregation.

[17]ECF No. 54-6, at 5 & 23.

[18]*Id.*, at 13.

[19]*Id.*, at 11-12.

[20]At one point during an argument on a pretrial motion to set reasonable bail with house arrest, the presiding state district judge read from a longer list of 11 out-of-custody infractions. ECF No. 10-17, at 8-9. It does not appear that this Court has been provided with a coextensive list reflecting the total number of times that Ford had been arrested and/or *Mirandized* prior to February 24, 2003. As also noted *infra* in note 21, the same judge ruled on the motion to suppress and thus would have been aware of petitioner's full history in this regard at the time of his ruling, which was specifically referenced in argument on the motion to suppress.

after October 20, 2001, for burglary and attempt grand larceny (ultimately pleading guilty to petty larceny); (2) on October 27, 2001, for burglary, grand larceny and battery (ultimately pleading guilty to grand larceny); and (3) on January 18, 2003, for a January 11, 2003, burglary (to which he pled guilty). He additionally had been given *Miranda* warnings and interviewed in connection with a November 14, 2002, burglary for which he was not formally arrested until after he already was in custody on the charges in the present case. Police reports further reflect that after being *Mirandized* on October 27, 2001, Ford requested that a parent be present before questioning, reflecting that he in fact was cognizant of his ability to do so per juvenile *Miranda* advisements.[21]

On February 24, 2003, following the burglary and murder, Officer Dennis DeVitte was on patrol in the same general vicinity. He received a bulletin to be on the lookout for a white male teenager on a moped, followed thereafter by a bulletin to be on the lookout specifically for Mark Ford. At approximately 5:45 p.m., he observed an individual who ultimately proved to be Mark Ford on a moped. Officer DeVitte ultimately apprehended Ford, inquired as to his identity and home address, handcuffed him, performed an external patdown search, and placed him in the back of his patrol car.[22]

Homicide Detective Ken Hardy arrived a short time later. According to his testimony at the hearing on the later motion to suppress, Hardy asked Ford whether he would come to his office to be interviewed; and Ford agreed. The officers switched out handcuffs on Ford, and Hardy took Ford to his office. On the way to the office, Hardy and Ford engaged in only casual conversation.[23]

---

[21]See, e.g., ECF No. 11, at 9-13, 35-36 (*Miranda* warnings, with request for parent), 47 (*Miranda* warnings for the 11/14/2002 offense), 60 (*Miranda* warnings) & 61 (same). The foregoing summary comes from the State's motion to admit evidence of other acts. The Court's relevant focus is not on how many prior alleged offenses Ford had as reflecting on his character or propensity for criminality. Rather, the focus is on how many times petitioner had been arrested and *Mirandized* prior to his arrest in the present case and how familiar he was with the overall criminal justice process after having been through it several times. The state district court was aware of Ford's prior history via the motion to admit evidence of other acts at the time that it adjudicated the motion to suppress his statement in this case, particularly given that the two motions were orally argued together. References were made to Ford's prior history during the argument on the motion to suppress. ECF No. 42, at 28-29 & 30.

[22]ECF No. 15-1, at 16-34. The Court refers to the officer's trial testimony, which would not have been available at the suppression hearing, for context and to mark the approximate commencement of the time line on the day of Ford's arrest. In that regard, Officer DeVitte did not apprehend and arrest Ford immediately at 5:45 p.m.

[23]ECF No. 12, at 54-56 & 65-66.

It was undisputed on the motion to suppress that Ford was under arrest from the outset, for operating a moped without a license. At the homicide office, Ford was handcuffed to a table in the interview room. He was not informed that he was a suspect in a homicide investigation before the interview commenced. Both Detective Hardy and Detective George Sherwood were present in the interview room for the initial interview as well as thereafter, although each left the room at one point or another after the initial interview.[24]

Detective Hardy testified that, once at the interview room, there was no substantive conversation before Hardy read Ford the *Miranda* rights from a card. Ford signed a card with both adult and juvenile *Miranda* warnings, with "yes" checked on the juvenile "side" of the card in response to an inquiry as to whether he understood the rights listed.[25]

The initial interview was recorded both on an audiotape and on the interview room's video recording system. The transcript of the audio recording introduced into evidence at trial starts at 7:15 p.m. with Detective Hardy identifying the persons present. Ford affirms in response to Hardy's questions that he understands that he is under arrest, that Hardy read him his rights from the advisements card, that he marked that he understood his rights, and that he signed the card.[26]

The video introduced into evidence at trial begins also with a 7:15 p.m. (*i.e.*, 19:15) time stamp. The recording picks up mid-word as Detective Hardy is asking the above-referenced question shown in the audio transcript as to whether, *inter alia*, Hardy had read Ford his rights from the advisements card and he understood those rights.[27]

---

[24]ECF No. 12, at 56-57, 67, 73-75, 77, 94-95 & 121-23; ECF No. 16, at 35 (trial testimony as to arrest).

[25]ECF No. 12, at 56, 66-67 & 72. ECF No. 54-2, at 2. The third and fourth numbered advisements on the adult side of the card are combined together in the third numbered advisement on the juvenile side. There is no item number 4 on the juvenile side, but all of the rights identified in the four numbered items on the adult side are included in the three numbered items on the juvenile side. The next numbered item on the juvenile side is numbered as 5. That item consists of a question as to whether the interviewee wished to have a parent or guardian present. However, there are no "yes" or "no" checkoff boxes under that question, in contrast to the item number 6 question on the juvenile side as to whether the interviewee understood the rights on the card.

[26]ECF No. 54-3, at 2-3; see also ECF No. 12, at 57 & 71-72.

[27]See DVD exhibit manually filed via ECF No. 56 (Exhibit 115).

The initial interview continued for 32 minutes. The audio transcript reflects that the initial interview concluded at 7:47 p.m. (19:47), and the video introduced at trial concludes at approximately the same point at a 19:46:35 time stamp.[28]

Prior to that, at the 19:45:07 time stamp on the video, the following exchange occurred:

A   Can I have my mom here present at least?

Q   Sure. We'll call her and have her come down here. But we're just asking where you were at today and what your were doing and?

A   I told you. It's all written down right here.

Q   And everything you're telling us is the truth?

A   Yes. You can, you can, I was with my friends. [Ford then recaps his alibi narrative as to where he was and with who.]

ECF No. 54-3, at 40 (transcript).

Hardy followed with five questions as to what a friend was wearing when Ford said they were together. Hardy then ended the initial interview and turned off the audio recorder – approximately 1 minute and 28 seconds, and seven questions, after Ford had requested to have his mother present. Ford made only the one request to have his mother present during the 32 minute initial interview.[29]

The video system continued recording for another approximately two hours, a not insubstantial portion of which included "a lot of sitting around time."[30]

Significantly for the Court's analysis herein, the only interrogation statements *introduced at trial* from Ford's time at the homicide office were those in the above-referenced audio transcript and the redacted video (from the overall video) that also was limited to the same 32 minute initial interview.[31]

/ / / /

---

[28]See ECF No. 12, at 73; ECF No. 54-3, at 41; Manual DVD Exhibit, *supra*, at 19:46:35 time stamp.

[29]ECF No. 54-3, at 40-41; Manual DVD Exhibit, *supra*, at 19:45:07 to 19:46:35 time stamps. See also ECF No. 12, at 75-77 (Detective Hardy's related testimony at the hearing on the motion to suppress).

[30]E.g., ECF No. 12, at 73 (at lines 9-12, the questioner, in context, obviously instead meant the *video* tape).

[31]See text at 11 and note 39, *infra*.

1    After Detective Hardy turned off the audiotape recorder and concluded the initial interview, he

2  did inform Ford that they were investigating a homicide; and he continued a dialogue with Ford for

3  approximately 8 minutes, through 7:55 p.m.  Petitioner maintains that he did so while Ford asked three

4  more times, during that 8 minutes, to have his mother present.  She ultimately arrived at approximately

5  9:00 p.m., following a call from the detectives at some point after 7:55 p.m.[32]

6    None of the statements from that continuing 8 minute interrogation were introduced into

7  evidence at trial.

8    During the remaining time at the homicide office, shortly before Ford's mother arrived, Hardy

9  also asked him for consent to conduct a buccal swab.[33]

10   Any claims in Ground 1 under the Fourth Amendment as to the buccal swab have been

11  dismissed under *Stone v. Powell*, 428 U.S. 465 (1976).[34]

12   During the remaining time at the homicide office, after Ford's mother arrived, Hardy, *inter alia*,

13  allegedly obtained consent from Ford and his mother to take his clothes (for blood spatter analysis) and

14  had him change into other clothes.  They allegedly also consented to a photograph and fingerprinting.[35]

15   Petitioner's claims herein under the Fourth Amendment as to the clothing items admitted at trial

16  (some were excluded by the trial court on the motion to suppress) also have been dismissed under *Stone*.

17   The only issue before this Court pertains to Ford's statements in the 32 minute initial interview,

18  which were the only interrogation statements introduced at trial from the time at the homicide office.

19   ***State Court Proceedings***

20   In the state courts, the defense did not present argument seeking to exclude any of Ford's

21  statements as being involuntary and/or for lack of proper *Miranda* warnings at any time through the

22  conclusion of the evidentiary hearing on the motion to suppress.  The original motion instead sought

23

24     [32]ECF No. 12, at 77-83.  Petitioner's reply says that his mother saw him at 10:06 p.m., but 21:06 is 9:06 p.m.

25     [33]*Id.*, at 83-84 & 104-05; see also *id.*, at 114-15 (mother's contrasting testimony); *id.*, at 122-27 (Detective
26  Sherwood's rebuttal testimony).

27     [34]ECF No. 41, at 3-4 & 9.

28     [35]ECF No. 12, at 59-63 & 84-110; see also *id.*, at 111-121 (mother);  *id.*, at 122-27 ( Sherwood's rebuttal).

-10-

initially to suppress only "all evidence seized from all clothing material removed from the defendant." The motion thus outlined the events during the two-and-a-half hours at the homicide office solely in an effort to establish that Ford did not voluntarily consent to the seizure and search of his clothing.[36]

Subsequent to the suppression hearing, the defense filed a supplement to the motion to suppress. Ford sought, *inter alia*, to exclude: (a) all statements made at the homicide office on the ground that Ford's waiver had not been voluntary, knowing and intelligent because the detectives did not inform Ford that they were investigating a homicide, and the police allegedly could not mislead a juvenile; and (b) all statements made after he first requested to have his mother present at 7:45 p.m. during the initial interview on the ground that all questioning must be terminated immediately upon such a request. The defense argued these same two points at oral argument on the motion.[37]

The state district court, *inter alia*, denied the motion to the extent that it sought to suppress Ford's statements.[38]

Accordingly, per the district court's ruling, the State would have been able to introduce not only the full 32 minute initial interview but, as well, any additional statements including the 8 minutes of continued dialogue after Detective Hardy turned off the audiotape recorder.

As noted previously, however, the State restricted the evidence actually presented at trial to only the 32 minute initial interview. Counsel worked together to prepare a 32 minute video redacted from the overall two-and-a-half hour video, which began and ended at the same points as the transcript of the 32 minute audiotape. The transcript and the correlated redacted 32 minute video of the initial interview were the only interrogation statements from Ford's time at the homicide office that were admitted into evidence at trial. These statements were admitted subject to a continuing defense objection to the introduction of the statements based on the defense arguments on the motion to suppress.[39]

/ / / /

---

[36]ECF No. 11-12.

[37]ECF No. 12-3, at 6-11; ECF No. 12-7, at 3, 18-22 & 31-35.

[38]ECF No. 12-7, at 35-36 & 38.

[39]ECF No. 16, at 4 & 21-24. The trial exhibits appear to be equivalent to Exhibits 114 and 115 in this matter.

-11-

On direct appeal, Ford presented a combined argument challenging the denial of the motion to suppress under the Fourth Amendment as to the clothing, fingerprints, buccal swab and photograph and under the Fifth and Sixth Amendments as to admission of the 32 minute initial interview.[40] Ford presented approximately three pages of argument seeking to establish that the police had not followed Nevada state law requirements for the arrest and questioning of juveniles.[41] Ford then followed with an approximately one-page argument specifically on *Miranda* issues:

> With regard to Miranda rights, in the video, Detective Hardy does not read Mark his rights but tells him to read the card. At trial, when asked to recite what he told Mark when he gave him the Miranda warnings, Detective Harding [sic] did not recite the warnings correctly.[FN] (Trans. 2-25-04, p. 14) Detective Harding [sic] never told Mark that he had a right to an attorney before questioning and during questioning and if he could not afford one, the state would provide one for him. See rights recited in Kaczmarek v. State, 120 Nev. Adv. Op. 37, 91 P.3d 16 (2004). The need to inform the accused of his right to have an attorney present is fundamental to the Miranda scheme. United States v. Noti, 731, F.2d 610 (9th Cir. 1984). Additionally, the police should have made an attempt to have Mark's parents present prior to him waiving his Miranda rights.
>
> [FN] At trial, Detective Hardy testified that he said, "Those are your constitutional rights: That you have the right to remain silent; you have the right to have an attorney present; you have the right to not talk to us." Trans. 2-25-04, p.14.
>
> The failure on the part of the police to immediately notify Mark's parents, the failure to correctly tell Mark his Miranda rights and the failure to follow the procedures outlined in the Nevada Revised Statutes for juveniles mandates suppression of Mark's statement *because the police failed to follow procedures* which are there to ensure the statement is voluntarily given.

ECF No. 16-11, at 40-41 (emphasis added).[42]  The foregoing did not present argument otherwise seeking to challenge the voluntariness of the confession.

---

[40]ECF No. 16-11, at 34-41.

[41]*Id.*, at 37-40.

[42]Detective Hardy neither read Ford the *Miranda* rights nor told him to read the card during the audio transcript and video recording of record in this matter. Hardy instead said at the outset: ". . . I showed you your advisement of persons arrested . . . I read these to you and you marked that you, ah, understand your rights and you signed this card." ECF 54-3, at 3. The first sentence in the quote from the appeal brief therefore would appear to be incorrect.

The Supreme Court of Nevada rejected Ford's arguments under Nevada state law. The court held, *inter alia*, that, under Nevada law pertaining to the handling of juvenile offenders: (1) Ford properly was taken into custody for the juvenile traffic offense in the first instance and thereafter consented to being interviewed at the detective's office; (2) parental notification was not required before interviewing a juvenile as to any offense, including murder; and (3) nothing in Nevada statutory law permitted the parents of a juvenile in custody to participate in an interview by law enforcement, although the absence of notification to and the presence of a parent was a factor to be considered in determining the voluntariness of the statement. *See Ford v. State*, 122 Nev. 796, 800-03, 138 P.3d 500, 503-05 (2006).

The state supreme court further held as follows on the claim presented to that court:

> Here, Ford was fifteen years old at the time of the murder. Upon being detained, Ford agreed to accompany Hardy to a nearby police station to be interviewed about an investigation that was being conducted. At the police station, Ford was told that he was under arrest for driving a moped without a license. Ford was given his *Miranda* rights and advised that he could have a parent present during questioning.[FN8] He waived his *Miranda* rights and the opportunity to have his parents present. Because Ford's right to parental notification did not bear on the authority of the investigators to interview him, we conclude that NRS 62C.010 does not operate as a procedural bar to the admissibility of an otherwise voluntary statement. Here, Ford's statement was voluntary and therefore the district court properly admitted it.[FN9]

> [FN8] In *Marvin v. State*, 95 Nev. 836, 839 n. 4, 603 P.2d 1056, 1058 n. 4 (1979), we stated that, absent extraordinary circumstances, police should always have a responsible custodian present during interviews of children. We note, however, that this requirement has not been recognized as a constitutional right. *See Stone v. Farley*, 86 F.3d 712, 717 (7th Cir.1996) (stating that there is no federal statutory or constitutional requirement that juvenile's parents be notified before obtaining a confession); *People v. Pogue*, 312 Ill.App.3d 719, 243 Ill.Dec. 926, 724 N.E.2d 525, 531–32 (1999) (stating that juvenile has "no *per se* right to have a parent present during" or to consult with a parent before questioning). We do not need to reach that question in this appeal.

> [FN9] "'[F]indings of fact in a suppression hearing will not be disturbed on appeal if supported by substantial evidence.'" *Peck v. State*, 116 Nev. 840, 846, 7 P.3d 470, 474 (2000) (quoting *Stevenson v. State*, 114 Nev. 674, 679, 961 P.2d 137, 140 (1998)).

-13-

> We likewise reject Ford's argument that he was not properly given his *Miranda* warnings; the record clearly belies this argument.

*Ford*, 122 Nev. at 803, 138 P.3d at 505.

### *Federal Court Proceedings and Procedural Issues*

On federal habeas review, petitioner preliminarily filed a counseled first amended petition on April 16, 2013, in order to preserve all then-known available claims before the possible putative expiration of the federal limitation period. Ground 1 in that pleading tracked virtually verbatim the entire eight-page argument, including the Nevada state law contentions, from Ford's direct appeal brief challenging the denial of the motion to suppress as to both the physical evidence and statements.[43]

Petitioner contemporaneously sought and subsequently obtained leave to file a second amended petition following an opportunity for full investigation and review by appointed federal habeas counsel.[44] Petitioner advised within the later second amended petition, however, that "[t]his instant filing raises the same claims as the first with just a few minor alterations and edits."[45]

Accordingly, both before the Supreme Court of Nevada and in the specific factual allegations of the federal pleadings in this matter, petitioner challenged the admission of his statements under *Miranda* and its progeny on only the following three factual bases: (1) "[t]he failure on the part of the police to immediately notify [Ford's] parents;" (2) "the failure to correctly tell [Ford] his Miranda rights;" and (3) "the failure to follow the procedures outlined in the Nevada Revised Statutes for juveniles . . . because the police failed to follow procedures which are there to ensure the statement is voluntarily given."[46]

On respondents' motion to dismiss, the Court thereafter dismissed the portions of Ground 1 relying upon Nevada state law and the Fourth Amendment. (See ECF No. 41, at 3-5 & 9.)

---

[43]Compare ECF No. 9, at 8-12, with ECF No. 16-11, at 34-41.

[44]ECF Nos. 19 & 20. In past cases, the Court has expressly approved such a two-step procedure in situations where federal habeas counsel is appointed with a limited amount of time remaining prior to the possible putative expiration of the federal limitation period.

[45]ECF No. 28, at 7.

[46]See quoted material in the text, *supra*, at 12.

-14-

1    Accordingly, following the dismissal, the only remaining relevant specific factual bases alleged

2  by petitioner in his federal pleadings in challenging the admission of his statements consisted of

3  allegations as to: (1) "[t]he failure on the part of the police to immediately notify [Ford's] parents;" and

4  (2) "the failure to correctly tell [Ford] his Miranda rights."

5    In the answer, respondents noted the Court's reference, in the order on the motion to dismiss,

6  to the determination of voluntariness based upon a test looking to the totality of the circumstances.

7  Respondents noted the narrow factual bases relied upon in support of the claim presented to the

8  Supreme Court of Nevada, and respondents objected to the consideration of any additional factual bases

9  on federal habeas review, on the basis of exhaustion.[47]

10    In the reply, petitioner suggested, *inter alia*, that respondents anticipatory exhaustion defense

11  should be rejected in part because it was not raised in the initial motion to dismiss, as is required by the

12  Court's scheduling order.[48]

13    The reply further – in contrast to the only one page in the second amended petition directed

14  specifically to *Miranda* relying upon only two (remaining) factual bases – presented over 16 pages of

15  argument on voluntariness in the reply based upon multiple specific factual bases presented neither to

16  the state supreme court nor in the federal pleadings.  Petitioner sought to base the claim upon additional

17  factual allegations, *inter alia*, that: (1) Ford was "questioned for over two and a half hours;"[49] (2)

18  "[Detective] Hardy's actions were calculated to obscure and downplay the importance and purpose of

19  *Miranda* warnings" and his "conduct was not designed to inform Ford of his rights, but was instead

20  meant to distract Ford in order to obtain his statement without regard to the dictates of *Miranda*;"[50] (3)

21  the police "stopped the questioning [only] after Ford's fourth request to call his mother"[51] such that,

22  "[e]ven assuming *arguendo* that the warnings had been made clear to Ford, they were rendered void by

23

---

24    [47]ECF No. 48, at 8-9.

25    [48]ECF No. 53, at 13-14.

26    [49]ECF No. 53, at electronic page number 12.

27    [50]*Id.*, at 17 & 21.

28    [51]*Id.*, at 12 & 19.  At the latter page, the reply maintains that the interrogation instead continued even then.

the subsequent acts of the detectives – ignoring Ford's multiple requests for his mother to be present" such that "Ford was, in effect de-*Mirandized*;"[52] (4) Ford was not told that he was a suspect in a homicide case and was misled to believe that the investigation concerned only a stolen moped;[53] (5) "the status of his mental health [and] his troubled background" contributed to rendering the statement involuntary;[54] (6) "the coercive setting and handcuffing of Ford to the table" contributed to rendering the statement involuntary[55] and (7) "the ultimately confrontational interviewing techniques that were used against Ford [referring to the continued interrogation after the audiotape recorder was turned off]"[56] contributed to rendering the statement involuntary.

Turning to disposition of the procedural issues currently presented on Ground 1, the Court notes at the outset that respondents did not act in contravention of the scheduling order[57] by raising an exhaustion defense to any post-petition expansion of Ground 1. The requirement in the scheduling order that respondents raise all affirmative defenses in their initial responsive pleading necessarily applies only to defenses extant at the time that the initial responsive pleading is filed. The presentation of affirmative defenses to a post-petition expansion of a claim, such as in the federal reply, is not precluded by the scheduling order.

While the Court's statement of background case law in the order on the motion to dismiss did not operate to expand Ground 1, Ford's reply does seek to expand the claim materially and substantially.

In order to fairly present and exhaust a federal claim in the state courts, a petitioner must present *both* the operative facts and the federal legal theory upon which the claim is based together in the claim presented in the state courts. *See, e.g., Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005). As the *en banc* court recognized in *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014), basing a claim on

---

[52]ECF No. 53, at 21.

[53]*Id.*, at 23 & 25.

[54]*Id.*, at 25.

[55]*Id.*

[56]*Id.*, at 24 (at lines 8-12) & 25 (lines 20-21).

[57]ECF No. 29.

different factual allegations in federal court potentially can render an otherwise exhausted claim unexhausted :

> . . . . A claim has not been fairly presented in state court if new factual allegations either "fundamentally alter the legal claim already considered by the state courts," *Vasquez* [*v. Hillery,*] 474 U.S. [254,] 260 [(1986)]; *Beaty* [*v. Stewart,*] 303 F.3d [975,] 989-90 [(9th Cir. 2002)], or "place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it." *Aiken* [*v. Spalding,*] 841 F.2d[ 881,] 883 [(9th Cir. 1988)]; *accord Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir.1988).

740 F.3d at 1318.

The claim as specifically argued before the Supreme Court of Nevada, and as also presented in the federal petition as amended, challenged the admission of a 32-minute custodial interrogation of a fifteen-year-old juvenile on the grounds that the police failed to notify his parents before the interrogation, failed to correctly advise him of his *Miranda* rights, and failed to follow Nevada state procedures for the detention and interrogation of juveniles.[58]

The claim in the federal reply, in contrast, seeks to challenge the voluntariness of statements from an allegedly two-and-a-half hour custodial interrogation of a fifteen-year-old juvenile with mental health issues and a troubled background on the additional grounds that the police told Ford that the investigation was about a stolen moped rather than a murder;[59] that the detective engaged in calculated stratagems to undermine the allegedly deficient *Miranda* warnings that were given; that the detectives continued the interrogation despite Ford requesting the presence of his mother four times, such that Ford was "de-*Mirandized*;" and that ultimately confrontational interrogation techniques were used against the juvenile, all while he was placed in a coercive setting and handcuffed to the interview table.

---

[58]As noted previously, Ford's direct appeal briefing argued only that his statements should be suppressed "*because the police failed to follow procedures* which are there to ensure the statement is voluntarily given." Ford's state appellate briefing – and the virtually identical federal second amended petition as well – did not present specific factual argument otherwise challenging the voluntariness of the statements. See text, *supra*, at 12. Citing cases did not present factual argument as to *this* case. The state high court went further, however, and specifically held that "Ford's statement was voluntary." 122 Nev. at 803, 138 P.3d at 505. A claim challenging the voluntariness of the statement – albeit on the record and arguments presented to the state supreme court – thus was decided on the merits and exhausted.

[59]This point and the point *infra* based on multiple requests for Ford's mother were argued in the state district court, but they were not pursued further in the legal argument specifically addressed to this claim when it was argued on direct appeal.

These extensive additional factual allegations were not argued in support of this claim when it was presented to the state supreme court, and they would place the claim in a significantly different and stronger evidentiary posture (if all of the allegations in fact were true) than when the state court considered it. The claim as presented in the reply thus is unexhausted. *Dickens, supra; Aiken, supra*.

Further, federal habeas pleading is not notice pleading. A petitioner must allege the specific operative facts upon which he bases his claim with particularity in the petition. *E.g., Mayle v. Felix*, 545 U.S. 644, 655-56 (2005). A petitioner therefore may not use a reply to an answer to raise additional claims and supporting operative factual allegations that are not included in the federal petition as amended. *E.g., Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). Here, petitioner presented both an overall voluntariness claim as well as significant operative factual allegations that were not presented in the second amended petition.

The Court, in the exercise of its discretion, accordingly does not find the expanded allegations of Ground 1 in the reply to be properly before the Court. Petitioner, through counsel, had ample opportunity to file an amended petition with all relevant claims and allegations, but petitioner instead – after a full opportunity to do more – opted to present only the claims and allegations that had been presented to the state supreme court.[60] The presentation of extensive additional claims and allegations for the first time in the federal reply prejudices respondents because it denies them a timely opportunity to present relevant procedural defenses, such as exhaustion, and otherwise to respond to the new claim and expanded factual arguments. Moreover, the late presentation prejudices the prompt and efficient administration of justice. The Court finally is able to reach this matter as ostensibly postured for final disposition only to find that a ground has been substantially altered and expanded in the reply, raising the prospect potentially of extended additional proceedings pertaining to exhaustion, possibly a stay request, procedural default and arguments as to cause and prejudice, and, finally, allowance of an opportunity for respondents to respond to the expanded claim on the merits. It is too late in this case for that. A petitioner must use the petition and amendments thereto – not the reply – to fairly and timely apprise respondents and the Court of the operative facts supporting the petitioner's claims.

---

[60]See text, *supra*, at 14.

-18-

In all events, as discussed *infra*, even if the Court were to consider the additional voluntariness claim and operative factual allegations argued in the federal reply, they do not establish a basis for federal habeas relief herein.

However, the Court first considers the claim as it was actually argued to the state supreme court and actually alleged in the second amended petition.

### *Disposition on the Merits*

#### *Disposition of the Claim as Alleged in the Second Amended Petition*

On the claim actually presented in the second amended petition, petitioner challenges the following factual finding by the state supreme court: "We likewise reject Ford's argument that he was not properly given his *Miranda* warnings; the record clearly belies this argument." *Ford*, 122 Nev. at 803, 138 P.3d at 505. Petitioner urges in the federal reply that this finding constituted an unreasonable determination of fact under § 2254(d)(2). He contends that the finding was unreasonable because "[t]he transcribed statement and the video recording do not begin until **after** the advisement, so there is no record of what Det. Hardy's precise advisement was to Ford with regard to his rights."[61]

Petitioner cites no apposite controlling law holding that there must be a contemporaneous audio or video record of the officer giving the *Miranda* warnings as a necessary prerequisite to a court finding that the warnings were given correctly. *Miranda* warnings of course are given in a wide variety of circumstances where there is no recording equipment, although such equipment ultimately was used here. In this case, the state court record reflects that: (1) Detective Hardy states at the beginning of the tape that "I showed you your advisement of persons arrested . . . I read these to you and you marked that you, ah, understand your rights and you signed this card;" (2) Ford acknowledged that that was correct; and (3) the card with (a) both adult and juvenile advisements, (b) "yes" checked in response to the query as to whether the signer understood the rights, and (c) Ford's signature was filed in the state court record.[62] The foregoing was an abundantly sufficient basis from which the state supreme court reasonably could find that Ford was properly given *Miranda* warnings. In the face of such a strong, and

---

[61]ECF No. 53, at 29 (emphasis in original).

[62]ECF No. 54-2; ECF No. 54-3, at 3.

uncontradicted, supporting record, this Court clearly cannot say that "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor, supra*. The state supreme court's factual finding constituted a reasonable determination of fact under § 2254(d)(2).

The only argument that petitioner otherwise made – on direct appeal, in the second amended petition, and in the federal reply – attempting to challenge the correctness of the *Miranda* warnings given was based on the fact that Detective Hardy did not correctly recite the full *Miranda* warnings from memory *during his trial testimony*.[63] The state supreme court's implicit rejection of this frivolous argument clearly was neither contrary to nor an unreasonable application of clearly established federal law. The card expressly stating the *Miranda* rights, Ford's signature on that card acknowledging that he understood the rights, and Ford's acknowledgment at the beginning of his recorded statement that he had read, understood, and signed the *Miranda* rights card provided ample evidence that Ford was correctly advised of his federal constitutional rights under *Miranda*. There is no nonfrivolous argument that the detective's inability to completely state the *Miranda* rights off the cuff from memory one year later during his trial testimony establishes anything relevant to the contrary.

With regard to the failure to notify a parent prior to questioning, petitioner necessarily concedes that there is no United States Supreme Court precedent establishing that a parent must be present prior to interviewing a juvenile as a *per se* precondition to the admission of a juvenile's otherwise voluntary statement.[64] Petitioner's claim in the state supreme court, and as parroted in the second amended petition, was based primarily upon alleged notification requirements of Nevada statutory law in this regard. The salient point on federal habeas review, however, is that there is no Supreme Court precedent establishing that notification of and/or presence of a parent is a necessary precondition to a voluntary statement by a juvenile.

*/ / / /*

---

[63]See ECF No. 16-11, at 40 (direct appeal brief); ECF No. 53, at 19 (reply).

[64]See ECF No. 53, at 25, lines 4-6, & 28, lines 9-12. The Court discusses the absence of the mother otherwise as a factor pertaining to voluntariness *infra*, in the discussion of the expanded claim in the federal reply.

The state supreme court's rejection of the claim actually presented in the second amended petition thus was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

The Court notes that – the prior partial dismissal order notwithstanding – petitioner continues to present argument in the reply directed to petitioner's understanding of the Nevada state law procedures allegedly required when a juvenile is detained and questioned.[65] This Court dismissed petitioner's Nevada state claims as noncognizable on federal habeas review, and the Supreme Court of Nevada further rejected Ford's claim that the police failed to comply with Nevada state law. The Supreme Court of Nevada is the final arbiter of Nevada state law. It thus is established for this case that Ford was detained and questioned in compliance with the applicable Nevada state law, to the extent that that point otherwise is relevant to any federal issue in this case. That is the end of that matter.

Ground 1, as alleged in the second amended petition, therefore does not provide a basis for federal habeas relief.

### Disposition of the Claim as Expanded in the Federal Reply

The foregoing addresses the claim actually presented to the Supreme Court of Nevada in the direct appeal briefing and the corresponding identical claim in the second amended petition.

As noted previously, Ford's state appellate briefing – and the virtually identical federal second amended petition – did not present argument otherwise challenging the voluntariness of the statements. The state supreme court nonetheless went further, however, and specifically held that "Ford's statement was voluntary." 122 Nev. at 803, 138 P.3d at 505. A claim challenging the voluntariness of the confession – albeit on the record and factual allegations presented to the state supreme court – arguably thus was decided on the merits and exhausted.

This Court has held that petitioner may not pursue that claim for the first time in the federal reply given that it was not alleged in the second amended petition. However, even if the Court considers the claim, both as exhausted by the state supreme court decision and as substantially expanded in the federal reply, Ground 1 does not provide a basis for federal habeas relief.

---

[65]See ECF No. 53, at 16 n.3 & 19-21.

In *Fare v. Michael C.*, 442 U.S. 707 (1979), the Supreme Court outlined the law applied in determining whether a statement by a juvenile is voluntary:

> *Miranda* . . . recognized that after the required warnings are given the accused, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S., at 475, 86 S.Ct., at 1628. We noted in *North Carolina v. Butler*, 441 U.S., at 373, 99 S.Ct., at 1757, that the question whether the accused waived his rights "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." Thus, the determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. *Miranda v. Arizona*, 384 U.S., at 475–477, 86 S.Ct., at 1628–1629.
>
> This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits — indeed, it mandates — inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. *See North Carolina v. Butler, supra*.
>
> . . . . Where the age and experience of a juvenile indicate that his request for his probation officer *or his parents* is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination. At the same time, that approach refrains from imposing rigid restraints on police and courts in dealing with *an experienced older juvenile with an extensive prior record* who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation.

442 U.S. at 724-26 (emphasis added).

Where the record reflects that the interviewee was given and understood the *Miranda* warnings, an uncoerced statement made thereafter establishes an implied waiver of the right to remain silent, without any necessity that the State instead show the execution of an express waiver. *E.g., Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

-22-

Under AEDPA, evaluating whether a rule's application was unreasonable requires consideration of the rule's specificity.  The more general the rule, the more leeway state courts have in reaching outcomes in case-by-case determinations.  *E.g., Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Moreover, in conducting review under § 2254(d), a federal habeas court must determine what arguments or theories supported – or could have supported – the state court's decision and determine "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holdings" of the Supreme Court.  *Richter*, 562 U.S. at 102.  "There is no text in the statute requiring a statement of reasons," and a state court need not cite or even be aware of the Supreme Court's precedents so long as neither the reasoning nor the result of its decision contradicts them.  *Richter* 562 U.S. at 98.

In *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011), the *en banc* court held that a state court ruling that a statement was voluntary constituted an unreasonable application of clearly established federal law because the state court "analyzed the individual circumstances of the interrogation without weighing the totality of the circumstances," "failed to consider 'whether [the defendant's] will was overborne by the circumstances surrounding the giving of the'" statement, "dismissed each relevant fact seriatum without considering whether [the defendant's] will was overcome" by those circumstances, and failed "to actually weigh, rather than simply list, the other factors that have been delineated for consideration by the United States Supreme Court."  649 F.3d at 1015.

The Court accordingly will proceed on the assumption that the *en banc* holding in *Doody* would require that this Court review the totality-of-the-circumstances issue *de novo* because the state supreme court made, in pertinent part, only a conclusory holding that "Ford's statement was voluntary."[66]

Even on such a *de novo* review, a large portion of Ford's argument in the federal reply simply has nothing to do with the voluntariness of the 32 minute initial interview actually admitted at trial.

---

[66]The Court reiterates that such an issue was not presented to the Supreme Court of Nevada on direct appeal and also was not presented in the second amended petition.  Considering the claim presented instead for the first time in the federal reply as being properly before the Court thus potentially would lead to a federal court decision that the state supreme court decision unreasonably rejected a claim not actually presented to that court, for an alleged failure to fully articulate an analysis not called into play by the specific factual arguments on direct appeal.  Those arguments instead challenged an alleged failure to follow specific procedures, without presenting a challenge to the voluntariness of the petitioner's statements based upon the totality of the circumstances.  AEDPA arguably requires more deference.

First, Ford was not interviewed for two-and-a-half hours. That never happened. He was at the homicide office for two-and-a-half hours, but he was not questioned for that entire period of time. There were an additional 8 minutes of questioning immediately after the audiotape recorder was turned off after the conclusion of the 32 minute initial interview. But none of that 8 minutes of questioning was introduced at trial. There simply is no good faith factual argument supported by the record before either the state or federal courts that Ford's will was overborne by two-and-a-half hours of nonstop questioning, either alone or in combination with other factors. Again, that never happened.[67]

Second, Ford did not request the presence of his mother four times before the interview actually introduced at trial was stopped. As discussed further *infra*, he made one such request near the end of the 32 minute initial interview. And he made three additional such requests in the 8 minutes of questioning after the audiotape recorder was turned off. But none of that 8 minutes of questioning was introduced at trial. There simply is no good faith factual argument supported by the record before either the state or federal courts that Ford's will was overborne during the 32 minute initial interview introduced at trial because the police ignored four requests to have his mother present, whether alone or in combination with other factors. That did not happen.[68]

Third, Ford was not subjected to "ultimately confrontational interviewing techniques" during the 32 minute interview actually introduced at trial. Petitioner refers in this regard to a change in the officers' tone and tactics during the 8 minutes of questioning after the audiotape recorder was turned off. But none of that 8 minutes of questioning was introduced at trial. There simply is no good faith factual argument supported by the record before either the state or federal courts that Ford's will was overborne during the 32 minute initial interview introduced at trial because the police engaged in unduly confrontational interviewing techniques, whether alone or in combination with other factors. That did not happen.[69]

/ / / /

---

[67]See text, *supra*, at 8-11.

[68]See text, *supra*, at 9-10.

[69]See text, *supra*, at 16.

All of these factual allegations argued at length in the federal reply pertained to what happened *after* the audiotape recorder was turned off. None of that interrogation was introduced at trial. None of that subsequent interrogation "de-*Mirandized*" Ford with regard to the prior statements actually introduced at trial or otherwise affected the voluntariness of his statements for the 32 minutes *before* the audiotape recorder was turned off.

Similarly, petitioner's allegation that Detective Hardy's actions "were calculated to obscure and downplay the importance and purpose of the *Miranda* warnings" is based on nothing more than rhetoric in the reply without any actual factual support in the record. All that the record reflects was that Ford was read the *Miranda* warnings from a card that is copied in the record, Ford checked "yes" reflecting that he understood the rights, Ford signed the card, Ford expressly acknowledged the foregoing at the beginning of the 32 minute interview, and Detective Hardy questioned Ford thereafter. The actual record is wholly bereft of any evidence that Detective Hardy did *anything* – other than simply asking Ford questions after giving him *Miranda* warnings – during the 32 minute initial interview in an effort to "obscure and downplay the importance and purpose of the *Miranda* warnings" with regard to the right to remain silent or the right to the presence of an attorney.[70] Unlike prior cases where such a factor was involved, there is no, for example, twelve interview transcript pages of equivocal explanations by the detective of the *Miranda* warnings wholly undercutting the warnings given. *Cf. Doody*, 649 F.3d at 991-92 ("What began as the reading of a single-page *Miranda* form morphed into a twelve-page exposition that negated the intended effect of the *Miranda* warning.") The actual factual record in this case contains nothing of that nature during the 32 minute initial interview.

Stripped of all of the foregoing irrelevance, a consideration of the totality of the – actual – circumstances would not lead the Court on a *de novo* review to a finding that Ford's will was overborne by the circumstances surrounding the 32 minute initial interview introduced at trial.

Ford was only fifteen years and seven months old at the time of the interview, but he also had fairly extensive experience with law enforcement and being interviewed by law enforcement. He had

---

[70]See text, *supra*, at 8-9. Petitioner's suggestion that Detective Hardy downplayed the significance of the warnings that were federally required under *Miranda* by not explicitly first determining his wishes as to having a parent present, as per petitioner's understanding at least of Nevada state law procedural requirements, is not persuasive.

been *Mirandized* on multiple prior occasions, and he was adequately *Mirandized* before the interview in the present case.  Petitioner refers to "his mental health [and] his troubled background."  However, the only psychological assessment in the state court record reflects that Ford had been a good student before problems at home began pulling his grades down from As and Bs to only average – but not failing – grades, that he had no cognitive impairments, that he understood the various roles of the personnel involved in the criminal justice system, and that he was competent to assist in his defense. The report further does not include any opinion reflecting that any of Ford's oppositional and other behavioral disorders affected his ability to rationally perceive his environment or made him more – rather than perhaps less – subject to suggestion and will-overbearing manipulation.  While there definitely had been problems and troubles at home and elsewhere in Ford's life, there was no approximately contemporaneous psychological assessment in the record reflecting that such issues rendered him incapable of understanding and voluntarily consenting to a waiver of his *Miranda* rights.[71]

The Court is benefitted in its review by having a video of the actual initial interview that was introduced at trial.  While Ford in fact was handcuffed to the interview table, there was nothing in the video recording supporting petitioner's bald allegation that Ford was subjected to a "coercive" environment, over and above that inherently involved in any custodial interrogation conducted in an interview room in a police detectives' office.  That is, the initial interview was not conducted in a coercive manner; and the questioning in the main was conducted only by Detective Hardy, with only brief questioning by the other detective, who is out of the camera's view for almost the entire video. The initial interview further was not exceedingly long, being concluded in only 32 minutes.

The detectives were not forthcoming during the initial interview about the fact that they were investigating a homicide rather than a minor offense.  However, such a lack of candor by the investigating officers, while relevant, does not necessarily establish that a statement, even by a juvenile, was not voluntary.  *See, e.g., United States v. Preston*, 751 F.3d 1008, 1026-27 (9th Cir. 2014)(*en banc*)("Assuredly, interrogating officers can make false representations concerning the crime or the investigation during questioning without always rendering an ensuing confession coerced.").  In the

---

[71]See text, *supra*, at 4-6.

-26-

present case, it does not appear from a review of the recording of the initial interview and the surrounding circumstances that the detectives' lack of candor in this regard operated to overbear Ford's will, whether alone or in combination with other factors.

The detectives further did not terminate questioning immediately after the one and only time – during the initial interview introduced at trial – that Ford requested to have his mother present. However, the interrogation – during the initial interview introduced at trial – continued for only a minute and a half and seven questions, with the questions being directed to the details of the clothing worn at the time by one of Ford's claimed alibi witnesses. It does not appear from a review of the recording of the initial interview and the surrounding circumstances that the detectives' continued questioning for this brief interval – during the initial interview introduced at trial – operated to overbear Ford's will, whether alone or in combination with other factors. Nor did Ford's request to have his mother present appear to constitute an immediate invocation of his right to remain silent, as of that point at least.[72]

Weighing all of the foregoing together, the Court considers that, on the one hand, Ford was only fifteen years and seven months old at the time of the interview, had oppositional and other behavioral disorders and a troubled background, was interviewed in a detectives' office interview room while under arrest and handcuffed to a table without a parent present, was not told that the detectives were investigating a homicide, and was subjected to a number of questions at the end of the initial interview after he asked for the first time to have his mother present. On the other hand, Ford had fairly extensive prior experience with law enforcement and interrogations, had previously been *Mirandized*, was adequately *Mirandized* in the present case, appeared to be a reasonably intelligent juvenile who had no cognitive impairments or psychological conditions identified approximately contemporaneously in the state court record that would make him unusually subject to suggestion or will-overbearing manipulation, was interviewed for only 32 minutes, was not subjected to an otherwise coercive environment over and above that inherent in being interviewed by the police in a custodial environment

_____

[72]See text, *supra*, at 9. Petitioner cites no apposite controlling precedent establishing as a matter of federal constitutional law that an interview must be concluded immediately once a juvenile requests that a parent be present, with any statement made thereafter being rendered *per se* inadmissible.

while handcuffed to an interview table, and was interviewed for only a minute-and-a-half and seven fairly innocuous questions in the interview introduced at trial after he requested the presence of his mother. When the Court considers and weighs all of the circumstances potentially weighing against a voluntariness finding in relation to those weighing in favor of a voluntariness finding, the Court finds, on a *de novo* review of the record, that Ford's will was not overborne by the circumstances surrounding the initial interview and that his statements therein were given voluntarily.

Ground 1 therefore does not provide a basis for federal habeas relief, even considering the expanded allegations presented in the reply and applying a *de novo* standard of review.[73]

---

[73]It accordingly follows *a fortiori* that an implicit rejection by the state supreme court of a voluntariness challenge based upon the totality of the circumstances withstands deferential review under the standards and methodology otherwise required under *Richter*. That is, a rejection of such a claim by the state supreme court was neither contrary to nor an unreasonable application of Supreme Court precedent – whether on the record and limited factual allegations in fact presented on direct appeal to the state high court or instead on the expanded factual allegations and arguments presented in the federal reply. This Court assumes *arguendo* that all of the factual circumstances potentially weighing against a finding of voluntariness discussed in the text actually were included in the record on direct appeal at the time of the state supreme court's consideration of the claim before it. That such is the case has not been affirmatively established on federal habeas review as to all such circumstances, however.

Petitioner's habeas counsel asserted in the reply that counsel would file a copy of the entire two-and-a-half hour video upon locating same. ECF No. 53, at 17 n.4. That statement was made over two years ago with no intervening filing. Given that only the 32-minute initial interview was introduced at trial, the entire overall video has no bearing on the disposition of Ground 1, whether on *de novo* or deferential review. If the interview introduced at trial had been substantially later in the overall video that perhaps would be a different matter. But the record instead reflects that the initial interview was at or near the beginning of the overall video and that all of the circumstances upon which petitioner seeks to rely from the remainder of the overall video all occurred after the initial interview.

The Court has no occasion to reach respondents' alternative harmless error argument.

At the end of the total two-and-a-half hours spent at the homicide office, Ford went home with his mother. According to Detective Hardy's trial testimony, the detectives, after receiving additional evidence, went to Ford's home in the early morning hours. His mother answered the door and called Ford from his room. Detective Hardy testified at trial to Ford's non-inculpatory responses to several additional non-custodial questions asked at that time. Ford then was arrested for the murder of Vincent Gomes. ECF No. 16, at 29-31.

No argument was made to the trial court, including on the motion to suppress, challenging the admission of the later statements. Nor does it appear that any such argument made to the state supreme court on direct appeal, in the second amended petition in this Court, or even in the greatly expanded claim in the federal reply. Any issues regarding the statements made prior to the early morning arrest are not before the Court. In any event, these statements were made while Ford apparently was not in custody and after he previously had been *Mirandized* during the initial interview, had reflected that he understood those rights, thereafter had answered questions in the initial interview, ultimately had had his request to have his mother present honored, and had been released from custody to his mother's care for several hours.

***Ground 2: Jury Instructions – Juvenile Intent Standard***

In Ground 2, petitioner alleges that he was denied due process of law, apparently in violation of the Fifth and/or Fourteenth Amendments, because the jury instructions for murder, manslaughter and self-defense allegedly held him to the same level of intent as an adult even though he was only fifteen years old at the time of the offense.

Petitioner at the very least refers to: (a) Jury Instruction Number 16 regarding inferring the state of mind of a party or witness; (b) Jury Instruction Numbers 19 and 20 defining murder in the first and second degree; (c) Jury Instruction Numbers 21 and 22 defining voluntary manslaughter; and (d) Jury Instruction Numbers 25-29 regarding self-defense. Of these charges, Instruction Numbers 21 and 22 collectively referred three times to a "reasonable person" and once to a "reasonable man."[74]

Petitioner alleges, *inter alia,* that the trial court erred by not instructing the jury that the "reasonable man" or "reasonable person" standard meant a reasonable person of Ford's age, intelligence, and experience under similar circumstances.

The Supreme Court of Nevada rejected the claim presented to that court on the following basis:

> *Jury instructions*
>
> Jury instructions 19 through 21 gave various definitions of murder in the first and second degree as well as voluntary and involuntary manslaughter in connection with the reasonable person standard. Ford argues that these jury instructions were erroneous because they held Ford to an adult standard of reasonableness as opposed to a child standard. Ford, however, did not object to these instructions at trial, and therefore, this court will review the instructions only for plain or constitutional error.
>
> The jury instructions at issue adequately permitted Ford's argument concerning the reasonable person standard. In fact, when arguing the reasonable person standard during closing argument, Ford's counsel stated, "[Y]ou have to consider what was going on in the mind of that child at that time."[FN] Accordingly, we conclude the jury instructions do not amount to plain error.
>
> > [FN] Additionally, during closing arguments, Ford's counsel argued that
> >
> > > Mark did not intend to kill Vincent Gomes. There's no intention. Mark is a boy. Now,

---

[74]ECF No. 16-2, at 18, 21-24 & 27-31.

> despite the seriousness of this charge and the horrible, horrible mistake he made that day, it doesn't change the fact that he still is a boy. He thinks like a child; he acts like a child; he reacts like a child. In his mind, nothing bad is ever going to happen.

122 Nev. at 804, 138 P.3d at 505-06 (citation footnote omitted).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court at the time of the state court decision. "Clearly established federal law" under § 2254(d)(1) includes only the Supreme Court's decisions as of the time of the relevant state-court adjudication on the merits. *Greene v. Fisher*, 565 U.S. 34 (2011). Ford does not cite any apposite holding of the United States Supreme Court – whether as of the current time or the time of the state supreme court's July 20, 2006, decision on direct appeal – requiring the application of different standards of intent in murder cases brought against juveniles from those otherwise applicable in prosecutions brought against an adult. The Supreme Court plainly has stated that "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413-14 (2009)(internal quotation marks omitted).

Petitioner nonetheless urges that, under *Bradley v. Duncan*, 315 F.3d 1091 (9th Cir. 2002), he need not "produce a spotted calf on the precise issue at hand" and that it is sufficient to reverse under AEDPA "that the due process violation involved . . . offends the principles previously enunciated by Supreme Court precedent and reaffirmed by [the Ninth Circuit's] case law." 315 F.3d at 1101.

*Bradley* relied in substantial part for this passage upon *Van Tran v. Lindsey*, 212 F.3d 1143, (9th Cir. 2000). *Van Tran* was specifically disapproved of – in multiple respects – in *Lockyer v. Andrade*, 538 U.S. 63, 71 & 75-76(2003). Reliance upon its progeny from fifteen years ago – rather than multiple clear intervening United States Supreme Court precedents as to the proper application of the deferential standard of review under AEDPA – is hardly persuasive.

In this vein, petitioner seeks to draw a "clearly established" specific rule that juveniles must be prosecuted under a different standard of intent than adults from general rules, *inter alia*, that: (1) the

-30-

jury must find the existence of each element of the charged offense, under, *inter alia*, *In re Winship*, 397 U.S. 358 (1970); (2) a jury instruction that lowers the prosecution's level of proof is inconsistent with the presumption of innocence, under *Cool v. United States*, 409 U.S. 100 (1972); (3) the right to present a defense is a minimum essential of a fair trial, under, *inter alia*, *Chambers v. Mississippi*, 410 U.S. 284 (1973); (4) under *federal circuit precedent*, a defendant is entitled to have a jury instruction on any theory of defense which has some foundation in the evidence, under *United States v. Escobar de Bright*, 742 F.2d 1196 (9th Cir. 1984), despite the fact that no such relevant theory-of-defense instruction was requested in this case; and (5) imposition of the death penalty for juvenile offenders violates the Eighth Amendment prohibition against cruel and unusual punishment, under *Roper v. Simmons*, 543 U.S. 551 (2005), despite the fact that neither the death penalty nor even a sentence of life without the possibility of parole was imposed in this case.[75]

Petitioner's reliance upon such broad precepts applying – for the most part – the Due Process Clause does not establish that the state supreme court's rejection of a proposed specific rule requiring an allegedly different standard of intent for juvenile offenders was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

At bottom, petitioner essentially is seeking *de novo* review of a *res nova* issue.

AEDPA does not permit the Court to overturn a state court decision on the merits on such an issue in that manner.

Ground 2 therefore does not provide a basis for federal habeas relief.[76]

*/ / / /*

---

[75]Petitioner instead potentially could be eligible for a parole from institutional confinement approximately 22 years after the date of the offense. See text, *supra*, at 1. The Court notes in passing that a review of his sentence structure on the NDOC website reflects that Ford was paroled to his second consecutive life sentence after ten years, and that he will be eligible for consideration for an institutional parole to his last consecutive sentence of 22 to 96 months on or about February 23, 2023.

[76]As reflected in its ruling on the motion to dismiss, the Court agrees with petitioner that Ground 2 states a cognizable federal law claim rather than one presenting only an alleged state law error. See ECF No. 41, at 8-9. The presentation of a cognizable federal claim at the pleading stage does not lead in and of itself to a conclusion, however, that the petitioner is entitled to relief on the claim following deferential review under AEDPA (or, for that matter, even on a *de novo* review). Cf. ECF No. 53, at 34-35 (the parties continued to argue cognizability after the Court's ruling).

The Court has no occasion to reach respondents' alternative harmless error argument.

***Ground 3: Confrontation and Autopsy Report Testimony***

In Ground 3, petitioner alleges that he was denied a right to confrontation, apparently in violation of the Sixth and Fourteenth Amendments, when – by an express defense stipulation – a pathologist who did not perform the autopsy of the victim testified to the contents of the examining pathologist's autopsy report.

The state supreme court rejected the claim presented to that court on the following basis:

> *Autopsy report*
>
> Dr. Paul Telgenhoff performed the autopsy on Gomes but was unavailable at the time of trial. Prior to trial, the State filed a notice of expert witnesses informing the district court and Ford that Dr. Larry Simms would testify in place of Dr. Telgenhoff, regarding the autopsy of Gomes. Ford stipulated to the substitution and only objected as to Dr. Simms' ability to give an opinion as to how the crime occurred. The district court granted Ford's request to limit Dr. Simms' testimony. Ford now argues that the admission Dr. Simms' testimony in place of Dr. Telgenhoff violated Ford's Sixth Amendment right to confrontation. We disagree.
>
> The right to confrontation may be waived by the failure to object to the use of affidavits or declarations prepared pursuant to a stipulation.[FN15] "The test for the validity of a waiver of a fundamental constitutional right is whether the defendant made 'an intentional relinquishment or abandonment of a known right or privilege.'"[FN16] Here, Ford waived his right to confrontation when he stipulated through counsel to the substitution of Dr. Simms for Dr. Telgenhoff. Accordingly, Ford's argument on appeal is without merit.
>
> [FN15] *Sparkman v. State*, 95 Nev. 76, 81, 590 P.2d 151, 155 (1979); *Drummond v. State*, 86 Nev. 4, 8 n. 2, 462 P.2d 1012, 1014 n. 2 (1970).
>
> [FN16] *Raquepaw v. State* 108 Nev. 1020, 1022, 843 P.2d 364, 366 (1992) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)), *overruled on other grounds by DeRosa v. Dist. Ct.*, 115 Nev. 225, 985 P.2d 157 (1999).

122 Nev. at 805, 138 P.3d at 506.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

Petitioner urges that under the general waiver standards in *Johnson v. Zerbst, supra*, defense counsel could not waive Ford's right to confrontation and that instead Ford himself personally must expressly, intentionally and voluntarily abandon his right to confrontation for a waiver to be valid.

-32-

1    An abundance of more apposite controlling, and long-established, precedent compels the

2 rejection of petitioner's argument, whether on deferential AEDPA review or even a *de novo* review.

3 *See, e.g., Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 313 n.3 (2009) ("The right to confrontation

4 may, of course, be waived, including by failure to object to the offending evidence . . . ."); *United States*

5 *v. Zepeda*, 738 F.3d 201, 207 (9th Cir. 2013), *pertinent portion of panel opinion expressly adopted by*

6 *en banc court*, 792 F.3d 1103, 1109 (9th Cir. 2015)("We agree with the three-judge panel's reasons for

7 rejecting Zepeda's other arguments, and we adopt them as our own.")(counsel's stipulation waived right

8 to confrontation); *Wilson v. Gray*, 345 F.2d 282, (9th Cir. 1965)("It has been consistently held that the

9 accused may waive his right to . . . confrontation and that the waiver of this right may be accomplished

10 by the accused's counsel as a matter of trial tactics or strategy.").

11    Moreover, petitioner does not cite any apposite precedent by the United States Supreme Court

12 holding prior to the state supreme court's 2006 decision that counsel may not waive a defendant's right

13 to confrontation as to particular evidence presented at trial.

14    Clearly, at the very least, fairminded jurists could disagree as to the correctness of the state

15 supreme court's decision rejecting this claim.[77]

16    Ground 3 does not provide a basis for federal habeas relief.[78]

17    ***Ground 4(a)(1):  Effective Assistance of Trial Counsel – Juvenile Intent Standard***

18    In Ground 4(a)(1),[79] petitioner alleges that he was denied effective assistance of trial counsel in

19 violation of the Fifth and Sixth Amendments when counsel failed to object to the use of an alleged

20 "adult standard" of intent in the jury instructions at trial and to offer instructions instead with an alleged

21 "juvenile standard" of intent.

22

23    [77]*See also Peters v. Glebe*, 2017 WL 1405047 (9th Cir., April 20, 2017)(state court's determination that

24 defendant waived his confrontation rights by, *inter alia*, failing to object at trial was neither contrary to nor an unreasonable application of clearly established federal law).

25    [78]The Court has no occasion to reach any of the remaining issues discussed by the parties as to this ground.

26 The state supreme court's rejection of this claim easily withstands review under AEDPA on the specific basis for decision expressly stated by that court.

27

28    [79]The Court has numbered the subparts of Ground 4 in a manner more consistent with standard practice in habeas matters in this District.

Background to this claim is set forth, *supra*, in the discussion of the corresponding independent substantive claim in Ground 2.[80]

First-chair defense counsel Curtis Brown, who was the county public defender's murder defense team chief at the time of the trial, testified at the state post-conviction evidentiary hearing.[81]

Brown testified that he did not proffer a "juvenile standard" of intent charge for the following reasons:

> Honestly, I didn't think it was necessary. I knew I was going to be arguing the mind of a 15 year old, the reasonableness of a 15 year old under those circumstances. And I did. I argued the heck out of, you know, what was going on in not just a normal person's mind but what was going on in Mark Ford's mind who was a 15 year old under those circumstances. So I knew I was arguing that. I can't tell you I made a decision not to discuss it, but I don't have a recollection of ever proffering it, but I didn't ever feel hampered in arguing it, if that makes sense.

ECF No. 17-35, at 17.

The Supreme Court of Nevada rejected the ineffective-assistance claim presented to that court on the following basis:

> [A]ppellant argues that counsel was ineffective for failing to object to a voluntary-manslaughter jury instruction that used an adult standard because it resulted in this court reviewing the claim for plain rather than harmless error on direct appeal. Appellant fails to demonstrate prejudice or deficiency. Appellant offers no cogent argument as to how a different standard of review on appeal would have affected the outcome of either trial or the appeal. *Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987). To the extent appellant argues that the failure to offer a jury instruction affected the outcome at trial, appellant failed to provide this court with the trial transcripts or jury instructions, thereby precluding review of the district court's disposition of the claim. *See Greene v. State*, 96 Nev. 555, 558, 612 P.2d 686, 688 (1980)("The burden to make a proper appellate record rests on appellant."). We therefore conclude that the district court did not err in denying this claim.

ECF No. 18-9, at 3.

On petitioner's claims of ineffective assistance of counsel, he must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance

---

[80]See text, *supra*, at 29-31.

[81]ECF No. 17-35, at 14-15 & 19.

fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). On the performance prong in particular, "[e]ven under a *de novo* review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. When the deferential review of counsel's representation under *Strickland* is coupled with the deferential standard of review of a state court decision under AEDPA, *Richter* instructs that such review is "doubly" deferential:

> . . . . The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

The state supreme court's determination that petitioner failed to demonstrate either deficient performance or resulting prejudice was neither contrary to nor an unreasonable application of *Strickland* on the record and arguments presented to that court on the state post-conviction appeal.

On the first *Strickland* prong, the state supreme court's determination that petitioner failed to demonstrate deficient performance on the part of trial counsel was not objectively unreasonable. An experienced criminal defense attorney did not believe that it was necessary to his trial strategy – in a murder prosecution tried in February 2004 – to request an instruction expanding on existing instructions referring to, *inter alia*, "an ordinarily reasonable person in the same circumstances" to specifically refer to "a reasonable person of Mark's age, intelligence, and experience under similar circumstances," because the existing charges permitted the argument that he wished to pursue. Petitioner's subsequent

-35-

disagreement with trial counsel's contemporaneous assessment in February 2004 does not establish that the state supreme court's holding was objectively unreasonable under the required doubly deferential standard of review.[82]

On the second *Strickland* prong, the state supreme court's determination that petitioner failed to demonstrate resulting prejudice with regard to the outcome at trial also was not objectively unreasonable. At the outset, the record that Ford presented to the Supreme Court of Nevada on the state post-conviction appeal in 2012 did not include the trial transcripts and jury instructions. However, even if this Court were to consider the entire state court record from the trial years earlier in 2004,[83] petitioner's bare supposition that there was a reasonable probability that the later-proposed jury charge

---

[82]The Court further notes that petitioner has not identified any apposite controlling federal or Nevada state precedent – whether in 2004 or currently – requiring that the now-proposed charge be given if requested by the defense. General theory-of-defense-instruction precedent does not necessarily establish that the particular charge proposed now would have been required if requested. In this same vein, petitioner places substantial reliance in his argument as to Ground 4(a)(1) upon the Supreme Court's decision in *Roper, supra,* holding that imposition of the death penalty for juvenile offenders violates the Eighth Amendment prohibition against cruel and unusual punishment. To the extent that *Roper* allegedly would have supported a defense argument for the now-proposed charge, *Roper* was not decided until March 1, 2005, more than a year after Ford's trial. *Roper* therefore would not have been available to trial counsel in framing an argument for an alleged juvenile intent standard. It is well-established under *Strickland* that counsel's performance must be evaluated from counsel's perspective at the time. *E.g., Richter,* 562 U.S. at 89. Counsel's perspective in February 2004 did not include any apposite controlling precedent requiring the specific charge proposed by petitioner after the fact and did not include the principal decision relied upon now by petitioner in *Roper.* (*Roper* further addressed the penalty that could be imposed; it did not hold that juvenile intent instructions are required.)

The Court notes additionally that – even on federal habeas review – petitioner has not identified what alternative language, if any, should have been used instead specifically in the murder charges as reflecting a lesser juvenile standard of intent. The further specification that he proposes for the general reasonable-person standard pertains directly only to language in the voluntary manslaughter and self-defense charges. Petitioner provides extensive legal and psychological argument as to why juveniles allegedly should not be held to an adult standard of intent on the charge of murder. But he presents no alternative language specifically for the murder instructions. It would be difficult to hold that trial counsel rendered deficient performance by not proposing entirely new and different jury instructions with a juvenile intent standard for murder in 2004 that petitioner's state appellate and state and federal post-conviction counsel have not otherwise presented even as of his last filing in 2015. It would be difficult as well to hold that the state supreme court was objectively unreasonable in rejecting an ineffective-assistance claim that, *inter alia,* was not specified in that regard.

[83]*Pinholster* would appear to establish "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. *See also id.,* at 192 n.14 ("Both parties agree that these billing records were before the California Supreme Court."). The Ninth Circuit has held *en banc,* however, that federal habeas review under AEDPA is not limited to the record actually before the appellate court that decided a claim on the merits but instead extends to all material in the entire state court record on file in the lower court. *See McDaniels v. Kirkland,* 813 F.3d 770, 780-81 (9th Cir. 2015), *on remand,* 839 F.3d 806 (2016), *petition for certiorari filed,* No. 16-8599 (April 4, 2017).

would have resulted instead in a verdict for voluntary manslaughter is not persuasive. That is, even on a more expansive record than that presented by petitioner to the state supreme court, the implicit conclusion by the court that there was not a probability of a different result sufficient to undermine confidence in the outcome was not an unreasonable application of *Strickland*'s prejudice prong.[84]

The state high court's conclusion that Ford failed to demonstrate resulting prejudice with regard to the outcome on appeal also was not objectively unreasonable. Ford has not cited apposite controlling precedent – whether existing now or at the time of the direct appeal in 2006 – establishing a reasonable probability of a different *outcome* – as opposed to a different standard of review – on appeal had counsel objected to the failure to give "juvenile standard" of intent instructions. The general principles from the cases upon which petitioner relies in his substantive claim in Ground 2 do not establish a probability of a different result sufficient to undermine confidence in the outcome on appeal.

Ground 4(a)(1) therefore does not provide a basis for federal habeas relief.

### Ground 4(a)(2): Effective Assistance of Trial Counsel – Concession of Second-Degree Murder

In Ground 4(a)(2), petitioner alleges that he was denied effective assistance of trial counsel when counsel conceded petitioner's guilt of second-degree murder in closing argument without arguing instead for the lesser included offense of voluntary manslaughter set forth in the jury instructions.

The State sought to convict Ford of first-degree murder under both intentional and felony-murder alternative theories. The State did not seek the death penalty in this case.[85]

At the time of the 2003 offense, the potential noncapital penalties on a first-degree murder conviction ranged from a minimum of a 50 year sentence with eligibility for parole consideration after 20 years, to a life sentence with the eligibility for parole after 20 years, to a life sentence without the possibility of parole.[86] At the time of the offense, conviction also on the weapon enhancement required

---

[84]See also the discussion of the trial evidence in Ground 4(a)(2), *infra.*

[85]*Roper, supra,* had not yet been decided.

[86]N.R.S. 200.030(4)(b), as amended through Laws 1999, c. 319, § 3. See also ECF No. 13, at 27 (listing of potential penalties during voir dire). At the time that trial counsel defended Ford in 2004, the Supreme Court had not yet curtailed the availability of a sentence of life without the possibility of parole for a juvenile homicide offender. *See*

(continued...)

-37-

imposition of an equal sentence consecutive to the sentence on the murder charge.[87]  Accordingly, if convicted of both first-degree murder and the enhancement, petitioner faced a minimum of a determinate 100 year aggregate sentence with no possibility of parole from physical custody for at least 40 years to a maximum of two consecutive life sentences without the possibility of parole.

At trial, the State presented evidence[88] tending to establish, *inter alia*, that: (1) 911 dispatch received a call from the Gomes residence at approximately 2:56 p.m. on February 24, 2003, wherein the caller said "I have a break-in here in my house," and then the connection was lost almost immediately;[89] (2) the caller reestablished contact at approximately 2:58 p.m., said that he had been stabbed, gave his name as Vincent Gomes and the address, and responded "a boy broke in" when asked who stabbed him;[90] (3) the caller was unable to say anything more of substance and apparently died while on the line with 911 before the police arrived at 3:04 p.m.;[91] (4) when the first officers and responders arrived at that time, they found Vincent Gomes, with no vital signs, lying in a pool of blood matching his own (as determined by later DNA analysis) beside a kitchen knife with an eight-inch serrated blade and also near a weeding tool, with blood matching Gomes' on both items;[92] (5) three

---

[86](...continued)
*Miller v. Alabama*, 567 U.S. 460, 479-80 (2012)(the Court held that mandatory life without parole sentencing of juvenile homicide offenders violates the Eighth Amendment, further stating that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon"); *see also Montgomery v. Louisiana*, 136 S.Ct. 718, (2016)("Before *Miller*, every juvenile convicted of a homicide offense could be sentenced to life without parole.  After *Miller*, it will be the rare juvenile offender who can receive that same sentence.").

[87]*See, e.g., State v. District Court (Pullin)*, 124 Nev. 564, 188 P.3d 1079 (2008)(statutory amendment changing sentencing on a weapon enhancement to a discretionary range did not apply retroactively to offenses occurring prior to July 1, 2007).

[88]The Court's summary of pertinent trial evidence does not constitute a finding of fact by this Court, and the Court does not necessarily summarize all relevant evidence in full.  See note 4, *supra*.

[89]ECF No. 14, at 67-70 & 74 (911 records custodian).

[90]*Id.*, at 71-72 & 74-75.

[91]*Id.*, at 72 & 75-76.

[92]*Id.*, at 115-33 (responding police officer); ECF No. 14-1., at 76-83 (crime scene analyst Smink); ECF No. 15, at 3-13 (crime scene analyst Szukiewicz); ECF No. 15-1, at 45-48 (criminalist Guenther).

witnesses who were in the neighborhood immediately around the time of the stabbing saw a youth and moped to one degree or another matching the description of Ford and the moped he was apprehended on that day in the immediate vicinity of the Gomes residence shortly before and/or after the stabbing, and before the police arrived;[93] (6) one of the three witnesses positively identified Ford at trial as the youth, after identifying him at the time from a photo lineup to a seventy-five percent certainty;[94] (7) one of the other two witnesses had seen the youth in the backyard of the Gomes residence;[95] (8) two additional witnesses who knew Mark Ford – from the time when he also had lived in the same neighborhood – separately saw him leaving the scene on the moped and independently positively identified him to the police following their arrival;[96] (9) investigation revealed that the knife came from the Gomes residence and that the weeding tool apparently had been stolen from a neighboring property;[97] (10) investigation further revealed, *inter alia*, signs of possible unsuccessful attempts at entry through a dining room window and a patio door as well as a successful entry through a bathroom window, with Ford's fingerprints being found on the interior windowsill;[98] (11) blood matching Vincent Gomes' DNA was found on the beanie or knit cap being worn by Ford when he was apprehended by police a relatively short time after the stabbing;[99] (12) Gomes died from a single downward stab wound, consistent with the kitchen knife, to the left side of his neck that penetrated approximately eight inches

---

[93]ECF No. 15, at 13-30 & 36-41(neighbor Robert Lewis); *id.*, at 55-75 (letter carrier Robert Main); *id.*, at 75-79 (postal business records witness); *id.*, at 80-92 (neighbor Susan Vonende); ECF No. 15-1, at 70-74 (Detective Wilson).

[94]ECF No. 15, at 25-26 & 32-36 (Lewis); ECF No. 15-1, at 74-77 (Detective Wilson).

[95]ECF No. 15, at 82-92 (Vonende).

[96]ECF No. 15, at 99-119 (Rona Goldman); *id.*, at 119-29 (Ryan Marstaeller). See also *id.*, at 129-34; ECF No. 15-1, at 1-16 (witness Rhonda Geist, who did not know Ford previously, also saw him leaving on the moped and she positively identified him at trial).

[97]ECF No. 14, at 42-45 & 64-65 (Roberta Gomes); ECF No. 15, at 49-51 & 53-54 (Timothy Smith).

[98]ECF No. 14-1, at 23-29, 40-42, 83-90, 104-07 & 113-16 (crime scene analyst Smink); ECF No. 15-1, at 58 (latent print examiner Geller); see also ECF No. 14, at 30-35, 38-40, 50-51 & 64 (testimony by Roberta Gomes regarding conditions prior to the break-in). A Ford print also was found on the patio screen door. ECF No. 15-1, at 65.

[99]ECF No. 14-1, at 122-24 (crime scene analyst Grover); ECF No. 15-1, at 50 (criminalist Guenther).

into and across his body, including into his right lung; and Gomes exhibited no other, defensive wounds;[100] (13) investigation revealed signs of attempted entry also of another neighboring residence likely on the same day;[101] and (14) Ford had committed two prior home entries or burglaries exhibiting substantial similarities, of which the State presented evidence in order to show motive, intent, a common scheme or plan, and absence of mistake or accident in entering the Gomes residence.[102]

The defense employed a strategy from the very outset of the trial of admitting a certain degree of culpability in an effort to contain Ford's exposure, which under the applicable law at the time extended potentially to, *inter alia*, two consecutive life sentences without the possibility of parole. As noted on the previous claim, the lead defense counsel employing this strategy was the county public defender's murder defense team chief.

In the defense opening, counsel began with an extended discussion of Ford's youth and his troubled childhood, referring to "youth and the impetuousness of youth and how immaturity makes for wrong choices in teens." Counsel acknowledged, *inter alia*, that Ford had committed the prior home entry offenses (as to which the evidence in any event would leave no doubt) and that he was at least attempting to enter the Gomes residence through the bathroom window when he was caught by Vincent Gomes. Counsel maintained that Gomes thereafter manhandled the adolescent Ford (the State contested Gomes' ability to do so given health issues) while effecting a citizen's arrest. He asserted that, after Gomes allegedly had Ford in a choke hold and dialed 911, Ford "in total panic, fear and immaturity" then "sees the handle of something; he grabs it, lunges and strikes at the neck area of the larger Gomes, without premeditation, but in the panic." Counsel closed the opening with the conclusion that "Mark Ford did not stab with any premeditation or intention of ending the life of Vincent Gomes."[103]

/ / / /

---

[100]ECF No. 14, at 94-95 & 98-109 (forensic pathologist).

[101]ECF No. 15, at 41-54 (Timothy Smith).

[102]ECF No. 15-1, at 78-111 (Pyramid Pines offense); *id.*, at 112-32 (Sunken River Trail offense). See also ECF No. 13-1, at 151-52 (representation in the State's opening statement as to the reasons for which the evidence was offered).

[103]ECF No. 14, at 8-15.

At a stopping point near the end of the State's case-in-chief, the trial judge *sua sponte* initiated a colloquy of Ford regarding the defense strategy being followed, outside the presence of the jury. The judge referred to a Nevada state case where a defense attorney had conceded culpability for second-degree murder in the defense closing argument. The judge stated his view that "the due process clause really doesn't permit an attorney to enter a guilty plea or admit facts that amount to a guilty plea without the client's consent." The judge then conducted an extensive colloquy of Ford wherein Ford personally acknowledged that he had heard counsel's opening statement, he knew that counsel was going to say what he did, he had fully discussed the strategy with counsel, he understood that it was his decision and not counsel's, he had consented to the strategy, and it was his strategy that defense counsel was following. After this colloquy, the judge found – with concurrence by counsel for both parties – "that he's fully aware of what you did and with his total consent," concluding with the remark that "I think that lays the issue to rest."[104]

Ford subsequently testified in the defense case-in-chief more or less along the lines outlined by counsel in the opening statement.

Ford testified, *inter alia*, that: (1) he had committed the prior home break-ins and that he did so because he wanted ("needed") money;[105] (2) he was trying to break into homes also on February 24, 2003, because he wanted money;[106] (3) at the Gomes residence, he was halfway through the bathroom window when Vincent Gomes grabbed his wrists and pulled him into the bathroom, with Gomes grabbing the weeding tool after Ford dropped it;[107] (4) Gomes kept angrily yelling at him asking why he was breaking into the house while Ford stood meekly saying that he was looking for a restroom;[108] (5) the still "very angry" and much larger Gomes then held Ford around the neck, pulled him through the living room to the kitchen, and roughly pushed him up against and then pinned him against the

---

[104]ECF No. 15, at 93-97.

[105]ECF No. 16, at 56-58. See also *id.*, at 101-01 (cross).

[106]*Id.*, at 60-66. See also *id.*, at 101-05 (cross).

[107]*Id.*, at 72-74. See also *id.*, at 105-12 (cross).

[108]*Id.*, at 73-74 & 110 (on cross).

kitchen sink;[109] (6) Ford was "just scared," "didn't want to go to jail," and "didn't want to be in the situation;"[110] (7) when Gomes started to reach for the phone, Ford tried to run, but Gomes pushed him hard up against the sink again and poked – but did not stab – at his chest with the weeding tool to keep him in place;[111] (8) Ford was scared because he had been stabbed before and he "was just scared and kind of panicked;"[112] (9) Ford saw a "handle" in the sink, "grabbed the handle and . . . took a step forward and . . . stabbed Mr. Gomes" in the neck as Gomes was attempting to make a call;[113] (10) he meant to stab Gomes "in that area;"[114] (11) Ford did not hear what Gomes was saying on the phone and did not know who he was calling;[115] (12) he was thinking at that moment that he "just wanted to get out of there;"[116] and (13) he "never wanted to kill him," and he "just wanted to, at least a little bit, hurt him or something to back him away from me."[117]

Ford acknowledged and/or maintained on cross, *inter alia*, that: (1) nothing was disturbed in the small bathroom when Gomes allegedly grabbed him and pulled him the rest of the way through the window;[118] (2) nothing was disturbed in the kitchen from their alleged physical altercation in the

---

[109]ECF No. 16, at 74-78, 112 (cross) & 114-16 (cross). The autopsy reflected that Gomes was 6 feet tall and weighed 244 pounds. ECF No. 14, at 111. Ford testified that he was 5'8" tall and weighed 140 pounds at trial but that he allegedly was only 5'7" tall and 110 pounds a year earlier at the time of the offense. ECF No. 16, at 75.

[110]ECF No. 16, at 78.

[111]*Id.*, at 78-80 & 117-20 (cross).

[112]*Id.*, at 79-81. See also text, *supra*, at 5 (prior stabbing incident).

[113]*Id.*, at 80-81. See also *id.*, at 120-21 (cross).

[114]*Id.*, at 81.

[115]*Id.*, at 119-20 (cross).

[116]*Id.,* at 81

[117]*Id.,* at 81 & 94 Ford additionally testified, *inter alia*, that he had "never been in a situation like that before." *Id.,* at 81. The trial court ruled that Ford thereby had opened the door to impeachment by cross-examination as to a third prior act that the court previously had excluded from evidence. In that incident, a homeowner tried to physically restrain Ford; and Ford kicked him in the groin while trying to escape. See *id.*, at 96-100 & 138-40.

[118]*Id.*, at 109-10, 112-14 & 124 (with the prosecutor referring to crime scene photographs in the cross).

-42-

kitchen;[119] (3) he "intended to stab" Gomes although he "[j]ust wanted to cut him," "[s]o I could hurt him, so he would back away;"[120] (4) he wanted to hurt Gomes "because [he] wanted to get away," and he wanted to get away "[b]ecause I was scared and I was panicky *and I didn't want to get in trouble;*"[121] (5) he did not want to get in trouble because he knew that he was committing a burglary and he wanted to get away from that burglary;[122] and (6) he stabbed Gomes deep into his body but nonetheless "intended to just cut him and scare him."[123]

The State countered Ford's narrative, in its case-in-chief and closing arguments, by maintaining, *inter alia*, that: (1) as noted, there were no signs of the physical struggle to which Ford testified in either the bathroom or by the kitchen sink;[124] (2) the retired and disabled former security guard was not physically capable of doing what Ford said that he did;[125] (3) the absence of defensive wounds strongly suggested that Ford stabbed Gomes in an unanticipated surprise attack;[126] and (4) stabbing someone seven or more inches deep into their body, nearly or fully to the hilt of the large knife, was not consistent with an individual merely lashing out in an effort to back the person off.[127] The State maintained that the circumstantial evidence instead supported an inference that Ford killed Vincent Gomes in a surprise attack to stop him from reporting the crime to the police, noting, *inter alia*, the fact that Gomes was reporting only a break-in – not a stabbing – when his first 911 call was suddenly cut off. (ECF No. 16-1, at 12, 16, 19, 20, 22-23, 77 & 85-90.)

---

[119]ECF No. 16, at 123-24.

[120]*Id.*, at 121.

[121]*Id.* (emphasis added).

[122]*Id.*, at 121-22. See also *id.*, at 131 (similar concession).

[123]*Id.*, at 122-23.

[124]ECF No. 16-1, at 19, 22-23 & 81-83 (closing/rebuttal); see also text and note at note 118, *supra.*

[125]ECF No. 16-1, at 34-36, 75-77, 81 & 83 (closing/rebuttal). ECF No. 14, at 18-23, 27, 45-58, 51-52 & 65-67 (Roberta Gomes); *id.*, at 110-12 & 114 (forensic pathologist).

[126]ECF No. 16-1, at 22-23 & 90 (closing/rebuttal); ECF No. 14, at 99-100 (forensic pathologist).

[127]ECF No. 16-1, at 12, 20 & 88-90 (closing/rebuttal); ECF No. 14, at 98-99 (forensic pathologist).

In the defense closing argument, counsel, *inter alia*, gave an extended argument as to why Ford was not guilty of an intentional first-degree murder, weaving together Ford's narrative with the State's evidence and with the characteristics that Ford displayed in his prior home entries. Counsel maintained that the State's theory that Ford struck down Gomes in a premeditated surprise attack to keep him from calling the police was inconsistent with the past incidents, in which Ford allegedly instead would try to avoid confrontation and run.[128]

Counsel then argued to the jury:

> Well, if it's not first degree murder, what is it? The law tells us second degree murder. A murder which is not murder of the first degree is murder of the second degree. That doesn't really help us out a lot. But what it does say is it's still murder.
>
> This is a murder. This isn't asking for forgiveness. This isn't letting somebody off light. This is murder. This is second degree murder.
>
> The only difference is you can have a premeditation to kill, you can have intention to kill, but if it wasn't formed with that rational thought and careful weighing, it wasn't deliberated.
>
> It could not have been deliberated; and if it's murder that was not deliberated, it's second degree murder, unless it's something else.
>
> Now something else would be what [counsel for the State] was talking about when he was giving examples of voluntary manslaughter, but I'll touch on that in just a moment.
>
> It tells us right here that the killing is still done with malice; it's just done without premeditation and deliberation; that is, without the willful, deliberate premeditated intent of taking the life.
>
> If it's not first degree, then it's second degree. If the State has failed to meet their burden with you in any one of those points or elements, it now becomes second degree murder.

ECF No. 16-1, at 63-64.

Counsel then sought to negate the alternative felony-murder theory of first-degree murder by arguing, *inter alia,* that: (1) the burglary allegedly was completed once Ford broke the plane of the threshold of the residence in entering, such that any later killing was not committed in the perpetration of the burglary; and (2) there was no forcible entry for home invasion. (ECF No. 16-1, at 65-67.)

---

[128]ECF No. 16-1, at 41-42 & 47-63.

Counsel concluded his discussion of felony murder as follows:

> Such causation [between the perpetration of the predicate felony and the killing] requires that the killing be linked to or part of the series of incidents to be one continuous transaction. The moment Mark was detained, any argument that a burglary is continuing is over. It has ended. He is in custody; he's under citizen's arrest.

> He's trying to escape the detention of the arrest and you can't do that either. That's why that's a different crime. That's why what Mark committed is a murder, but it's a second degree murder. That's why he's punished for that activity.

> Just because it doesn't fall within the felony murder doesn't mean he's not held accountable. He's held accountable, but he's held accountable under the proper theory, not applying this other area of law to try and overdraft an umbrella to incorporate him under a first degree murder theory.

ECF No. 16-1, at 67-68.

Counsel concluded his entire argument with a mixed discussion of both second-degree murder and voluntary manslaughter. He maintained that neither second-degree murder nor voluntary manslaughter constituted a forgiveness but instead constituted a recognition of human frailty. With regard to the reasonable-person standard in the voluntary manslaughter instructions, he maintained that "we do recognize as a society that their [*i.e.*, children] thought process is not that of an adult." He argued that "when it comes to rash impulse, you have to consider what was going on in the mind of that child at that time."[129]

The jury returned a verdict of second-degree murder with the use of a deadly weapon and burglary while in the possession of a deadly weapon.

At the state post-conviction evidentiary hearing, counsel explained, at length, the strategic decision made by the defense, including by Ford individually, in this regard. Counsel testified that there was a very high probability going into the trial that Ford would be convicted of first-degree murder; that the defense was concerned about biting off more in terms of persuasion than the jury would be willing to swallow; that the defense thought that going for voluntary manslaughter might have been asking for too much and come off as trying to get away with something; that the strategic decision thus

---

[129]ECF No. 16-1, at 68-70.

-45-

was made to argue for second-degree murder and leave the door open for the jury to find voluntary manslaughter, in order to try and avoid the harsher penalties for first-degree murder; that defense counsel discussed the strategy with Ford early on so that the defense opening statement and trial presentation would be consistent with the strategy chosen; and that Ford approved and consented to the strategy.[130]

Ford presented no contrary testimony at the state post-conviction evidentiary hearing seeking to establish that he was not consulted with about the strategy and that he did not agree to the strategy.[131] The trial record instead reflects, by Ford's own words, that – as counsel testified – Ford was consulted about the strategy prior to the opening statements and agreed to the strategy.[132]

The state district court found that defense counsel "made a reasonable and successful strategy decision in arguing for the second-degree murder charge instead of first-degree murder."[133]

The Supreme Court of Nevada held as follows with regard to the claim presented to that court:

> [A]ppellant argues that counsel was ineffective for not arguing to the jury that appellant committed only voluntary manslaughter. Appellant fails to demonstrate prejudice or deficiency. The district court's finding that counsel made a reasonable, strategic decision to argue that appellant committed second-degree murder is supported by substantial evidence in the record. *See Hernandez v. State*, 124 Nev. 978, 990–91, 194 P.3d 1235, 1243 (2008) (acknowledging that effective counsel may concede guilt). . . . . We therefore conclude that the district court did not err in denying this claim.

---

[130]ECF No. 17-35, at 15-16, 17-18 & 20-23. Petitioner points to counsel's early testimony at the evidentiary hearing – which was held nearly seven full years after the trial – that he did not "have a recollection of distinguishing" second-degree murder and voluntary manslaughter in his discussions with Ford. ECF No. 53, at 51; ECF No. 17-35, at 16. The lack of specificity of counsel's recollection of the particulars of a discussion had with a client seven years before notwithstanding, counsel clearly testified that: (1) "I need[ed] his permission to ask for anything, second degree, manslaughter, or something else if we were going to be pleading guilty, and he acknowledged that he understood we had to argue that way;" and (2) "[b]efore we could even do that through opening statements, I had – would have had to have Mark's approval that I'm essentially going to be pleading him guilty in my arguments to an offense." ECF No. 17-35, at 16. This testimony by counsel was corroborated by the contemporaneous colloquy conducted by the trial judge at the trial in 2004, with regard to the defense opening statement. See text, *supra*, at 40-41.

[131]A prior setting of the evidentiary hearing had been continued because the corrections department had not transported Ford. ECF No. 17-34. It thus would appear that Ford was present at the later evidentiary hearing to present any contrary testimony. Petitioner did not seek to present further testimony at the hearing or thereafter.

[132]See text, *supra*, at 40-41.

[133]ECF No. 18, at 3.

-46-

ECF 18-9, at 3-4. The court further again noted as to a related claim that petitioner had failed to provide the court with an adequate record on appeal, referring to the failure to file the trial transcripts and jury instructions in the record on the state post-conviction appeal.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*.

It clearly is not a *per se* unreasonable strategy for purposes of *Strickland* for a defense attorney to concede guilt on a charge in order to preserve counsel's credibility in seeking to persuade the jury to find the defendant not guilty on a charge with greater penalties. *See, e.g., Gallegos v. Ryan*, 820 F.3d 1013, 1027 & 1034 (9th Cir. 2016); *United States v. Martinez*, No. 13-30300, slip op. at *631-32 (9th Cir., Aug. 21, 2014); *United States v. Thomas*, 417 F.3d 1053, 1056-59 (9th Cir. 2005); *see also Florida v. Nixon*, 543 U.S. 175, 192 (2004)(it can be reasonable for defense counsel to concede guilt in a capital guilt-phase closing in an attempt to establish credibility with the jury for the penalty phase).

In the present case, the state court record clearly reflected that counsel's concession of second-degree murder, rather than arguing instead for voluntary manslaughter, was a strategic choice made by counsel, after consultation with Ford, prior to trial. Ford faced a substantial prospect of being convicted of first-degree murder with the use of a deadly weapon – with significantly greater penalties – on both the intentional and felony-murder alternatives, with only one such alternative being required. The defense nonetheless was able to persuade the jury to convict Ford instead of second-degree murder with use, even though the jury found him guilty of an offense that could serve as a predicate felony for first-degree murder.[134] The defense strategy employed at trial not only was reasonable, *it worked*.[135]

Ford's claim now that counsel – despite contemporaneous consultation with Ford and now that Ford no longer faces the more substantial penalties on a first-degree murder conviction that the strategy

---

[134]In contrast to counsel's closing argument as to the predicate felonies, the jury was instructed, *inter alia*, to "consider the facts and circumstances surrounding the perpetration or attempted perpetration of Burglary and/or Invasion of the Home as well as whether the acts before *and after* the perpetration or attempted perpetration of such crimes are so closely connected with the Murder as to form in reality a part of the occurrence." ECF No. 16-2, at 20 (emphasis added).

[135]The trial judge commended counsel's performance at the end of the trial and again at sentencing, reflecting essentially astonishment at sentencing that counsel was able to persuade the jury to not find Ford guilty of first-degree murder along with the predicate felony. See ECF No. 16-5, at 10 (sentencing); ECF No. 16-3, at 5 & 7 (end of trial).

successfully avoided – should have pressed further instead for a voluntary manslaughter verdict presents exactly the sort of *post hoc* challenge that *Strickland* precludes. As the Supreme Court stated in *Richter*:

> . . . It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." . . . .
>
> . . . . .
>
> . . . . Reliance on "the harsh light of hindsight" to cast doubt on a trial that took place now more than 15 years ago is precisely what *Strickland* and AEDPA seek to prevent. . . . .

562 U.S. at 105 & 107 (internal quotation citations omitted).

The state supreme court's rejection of this claim accordingly was not an objectively unreasonable application of *Strickland*, particularly under the doubly deferential review of counsel's performance required on deferential review under AEDPA.

Ground 4(a)(2) therefore does not provide a basis for federal habeas relief.[136]

### Ground 4(b): Effective Assistance of Appellate Counsel

In Ground 4(b), petitioner alleges that he was denied effective assistance of appellate counsel when counsel failed to raise a claim on direct appeal that the evidence was insufficient to support the conviction for burglary while in possession of a deadly weapon. Ford urges that the burglary verdict "does not fit" with the verdict of second rather than first-degree murder.

---

[136]The Court assumes, *arguendo*, that its review extends also to the full state court record from the original criminal proceeding and is not limited to the much narrower record that petitioner presented on the state post-conviction appeal. See note 83, *supra*. This Court's holding that the supreme court's conclusion that, *inter alia,* petitioner failed to demonstrate deficient performance withstands AEDPA scrutiny applies with even greater force on the more limited record presented to that court when it decided the merits of the claim. The Court further in all events would reach the same conclusion on a *de novo* review, even without the second layer of deference otherwise required under AEDPA.

Petitioner urges that defense counsel "admitted in his post-conviction hearing testimony that manslaughter should have been left open as an option for the jury to consider," but counsel "foreclosed that possibility by repeatedly arguing to the jury that Ford committed second degree murder." ECF No. 53, at 51. Petitioner takes counsel's testimony out of context. Counsel clearly testified – at length – to a defense strategic decision to *concede* second-degree murder, which is what the defense did at trial. Counsel did concede second-degree murder pursuant to that strategy while providing some minimal argument on manslaughter at the end of the closing to "try and leave the door open for manslaughter." What counsel did not do was risk losing the jury by failing to clearly argue for second-degree murder while perhaps "going too far" and losing the jury by trying to argue with the same emphasis for manslaughter. Nor did counsel run that same risk of losing the jury by arguing only equivocally between the two. Counsel clearly tried to avoid a guilty verdict on the first-degree murder charge, and did so successfully. Isolated statements taken out of the full context of counsel's post-conviction hearing testimony do not carry petitioner's burden under *Strickland* and AEDPA.

The Court has no need to consider *Strickland*'s prejudice prong. Petitioner must demonstrate both.

-48-

Appellate counsel testified that she did not raise the issue on direct appeal because: (1) "under NRS 205.060, under the burglary statute, he can still be convicted of a burglary while in possession of a firearm or a deadly weapon if he acquires that knife at any time during the commission of the crime;" and (2) "the facts were that after he entered the residence and had gotten in a fight with the owner, at one point he did acquire a knife which he then used."[137]

The Supreme Court of Nevada rejected the claim presented to that court on the following basis:

> Appellant argues that counsel was ineffective for failing to claim that insufficient evidence supported his conviction for burglary while in possession of a deadly weapon. Appellant reasons that the only way the jury's apparently inconsistent verdicts can be reconciled is to conclude that there must have been insufficient evidence to support one of the counts of which he was convicted. Appellant fails to demonstrate prejudice or deficiency. Appellant's reasoning is fatally flawed because whether a jury's verdicts are consistent is irrelevant to a review of a claim of insufficient evidence. *United States v. Powell*, 469 U.S. 57, 67 (1984); *see also Bollinger v. State*, 111 Nev. 1110, 1116–17, 901 P.2d 671, 675 (1995). We therefore conclude that the district court did not err in denying this claim.

ECF No. 18-9, at 3-4.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*.

When evaluating claims of ineffective assistance of appellate counsel, the performance and prejudice prongs of the *Strickland* standard partially overlap. *E.g., Bailey v. Newland*, 263 F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Effective appellate advocacy requires weeding out weaker issues with less likelihood of success. The failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to the client for the same reason – because the omitted issue has little or no likelihood of success on appeal. *Id.*

Petitioner's claim remains fundamentally flawed on federal habeas review. Any inconsistency in the jury's verdict does not establish that the evidence was insufficient on any count. Its verdict finding Ford guilty only of second-degree murder does not render the evidence insufficient on the

---

[137]ECF No. 17-35, at 7.

burglary count, even though a verdict of guilty on the burglary felony otherwise would have supported a first-degree murder verdict based upon a felony-murder theory. Petitioner cites no apposite United States Supreme Court or Supreme Court of Nevada precedent extant at the time of the 2005 briefing of the direct appeal that would have established that appellate counsel failed to pursue a potentially viable claim in this regard.

In the federal reply, petitioner nonetheless urges:

> The Nevada Supreme Court denied Ford's claim finding that Ford failed "to demonstrate prejudice or deficiency" and because a jury's inconsistent verdicts "is irrelevant to a review of a claim of insufficient evidence". (Ex. 110 at 3.) Ford's claim is not a challenge to the jury's inconsistent verdicts. Ford's claim is instead premised upon appellate counsel's failure to recognize the significance of the jury's inconsistent verdicts when analyzing Ford's assignments of error to be presented to the Nevada Supreme Court.

ECF No. 53, at 53.

Petitioner's premise remains fundamentally flawed. Petitioner's claim in Ground 4(b) is that counsel was ineffective for failing to challenge the sufficiency of the evidence on the charge of burglary with use of a deadly weapon. There was no "significance of the jury's inconsistent verdicts" for counsel to recognize in considering whether to pursue such a claim. There was no such significance, and petitioner cites no apposite controlling authority establishing such significance. Nor does petitioner present a viable argument as to why the evidence was insufficient to support the burglary conviction based on the actual trial evidence and separate and apart from relying on the alleged inconsistency of the verdicts, which is completely irrelevant. This claim is fundamentally flawed, under any standard of review.

Ground 4(b) does not provide a basis for federal habeas relief.

### *Consideration of Possible Issuance of a Certificate of Appealability*

Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant.

As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c), a petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Hiivala v. Wood*, 195

-50-

F.3d 1098, 1104 (9th Cir. 1999).  To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484.

The Court denies a certificate of appealability as to all claims, for the reasons below.  As general background, the Court has summarized trial evidence in the discussion of Ground 4(a)(2).  See text, *supra*, at 37-40.

In the portion of Ground 1 that remains before the Court, petitioner alleges that his rights under the Fifth and Sixth Amendments as recognized in the *Miranda* decision were violated after the police allegedly "did not correctly follow procedures for arresting" and interrogating him.  The Court has summarized factual background to the claim.  **See text, *supra*, at 2-10**.  The state supreme court's rejection of the limited claim presented to that court was neither contrary to nor an unreasonable application of clearly established federal law on the record and arguments actually presented to that court.  **See text, *supra*, at 10-14 & 19-21.**  Petitioner presented a greatly expanded claim for the first time in the federal reply, however.  The claim as expanded is unexhausted, and the Court further has held that the expanded claim is not properly before the Court because it was not presented in the second amended petition.  **See text, *supra*, at 14-19.**  However, even on a *de novo* consideration of the expanded claim, the record presented on federal review does not reflect that the statement actually introduced at trial was involuntary under the totality of the circumstances.  First, many of the factual allegations presented in the federal reply simply did not happen with regard to that statement.  **See text, *supra*, at 23-25.**  Second, the remaining, actual facts do not reflect that the statement was involuntary under the totality of the circumstances.  **See text, *supra*, at 21-23 & 25-28.**  Reasonable jurists thus would not find this Court's rejection of the claim, even as expanded, on the merits to be either debatable or wrong, regardless of how procedural issues otherwise presented by the late-breaking allegations in the federal reply might be resolved.

In Ground 2, petitioner alleges that he was denied due process because the jury instructions allegedly held him to the same level of intent as an adult even though he was only fifteen years old at the time of the offense.  Petitioner does not cite any apposite Supreme Court holding requiring the application of a different standard of intent in a murder case brought against a juvenile, or, in particular,

a "reasonable juvenile" standard as opposed to a "reasonable person (or man)" standard on the voluntary manslaughter and self-defense instructions. The broad general principles upon which he relies – such as the right to present a defense – do not establish that the state supreme court's rejection of the claim was contrary to or an unreasonable application of clearly established federal law. Reasonable jurists thus would not find this Court's conclusion that the state supreme court's rejection of the claim withstands deferential AEDPA review to be debatable or wrong. **See text, *supra*, at 29-31.**

In Ground 3, petitioner alleges that he was denied a right to confrontation when – by an express defense stipulation – a pathologist who did not perform the autopsy of the victim testified to the contents of the examining pathologist's autopsy report. Petitioner urges that the waiver of the right to confrontation cannot be effected by counsel and that the right instead can be waived only personally by the defendant. An abundance of apposite controlling authority holds to the contrary. Reasonable jurists would not find this Court's conclusion that the state supreme court's rejection of the claim withstands deferential AEDPA review to be debatable or wrong. **See text, *supra*, at 32-33.**

In Ground 4(a)(1), petitioner alleges that he was denied effective assistance of trial counsel when counsel failed to object to the use of an alleged "adult standard" of intent in the jury instructions and to offer instructions for a "juvenile standard" of intent. The state supreme court's determination that petitioner failed to demonstrate either deficient performance or resulting prejudice was neither contrary to nor an unreasonable application of clearly established federal law. Trial counsel testified that he did not believe that an instruction further expanding on the generic "reasonable person" standard was necessary to his trial strategy, and petitioner's disagreement with that assessment does not establish that the state supreme court's determination was objectively unreasonable under the required doubly deferential standard of review. With regard to prejudice at trial, petitioner's bare supposition that a "reasonable juvenile" instruction would have resulted instead in a verdict for voluntary manslaughter is not persuasive. With regard to the 2006 direct appeal, petitioner cites no apposite controlling authority extant as of that time establishing a reasonable probability of a different *outcome* – rather than standard of review – on direct appeal if the issue had been preserved by trial counsel. Reasonable jurists would not find this Court's conclusion that the state supreme court's rejection of the claim withstands deferential AEDPA review to be debatable or wrong. **See text, *supra*, at 33-37.**

In Ground 4(a)(2), petitioner alleges that he was denied effective assistance of trial counsel when counsel conceded petitioner's guilt of second-degree murder in closing argument without arguing instead for the lesser included offense of voluntary manslaughter. The state supreme court's determination that, *inter alia*, petitioner failed to demonstrate deficient performance was neither contrary to nor an unreasonable application of clearly established federal law. The state court record – from both the trial and state post-conviction evidentiary hearing – reflects that counsel made a reasonable strategic decision, after consulting with petitioner, to argue for second-degree murder in order to avoid a highly probable conviction for first-degree murder with much more substantial penalties extending – as of that time in 2004 – to possibly two consecutive sentences of life without the possibility of parole. This Court's discussion of Ground 4(a)(2) includes a detailed summary of the potential trial evidence, arguments by the State, and first-degree murder sentencing exposure that the defense faced when this strategic decision was made, which was prior to the commencement of the trial. Petitioner's claim now challenging that strategic decision, which in fact worked, presents exactly the sort of *post hoc* challenge that *Strickland* and AEDPA preclude. There accordingly is no need to reach the prejudice prong of *Strickland* on federal habeas review. Reasonable jurists would not find this Court's conclusion that the state supreme court's rejection of the claim withstands deferential AEDPA review to be debatable or wrong. **See text, *supra*, at 37-48.**

In Ground 4(b), petitioner alleges that he was denied effective assistance of appellate counsel when counsel failed to raise a claim on direct appeal that the evidence was insufficient to support the conviction for burglary while in the possession of a deadly weapon. The claim ultimately is grounded, even as recast in the reply, on a fundamentally flawed premise that an alleged inconsistency between the second-degree murder verdict and the burglary verdict has significant relevance to the sufficiency of the evidence on the burglary conviction. It does not. Reasonable jurists would not find this Court's conclusion that the state supreme court's rejection of the claim withstands deferential AEDPA review to be debatable or wrong. **See text, *supra*, at 48-50.**

A certificate of appealability accordingly will be denied as to all claims.

////

////

-53-

1      **IT THEREFORE IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** on

2 the merits and that this matter shall be **DISMISSED** with prejudice.

3      **IT FURTHER IS ORDERED** that a certificate of appealability is **DENIED**, for the reasons

4 stated at pages 50-53 of the Court's order.

5      The Clerk of Court shall enter final judgment accordingly, in favor of respondents and against

6 petitioner, dismissing this action with prejudice.

7      Dated: September 25, 2017.

8

9

10               ANDREW P. GORDON
                 United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28